GREGG CARTAGE & STORAGE CO. ET AL. *v.*
UNITED STATES ET AL.

No. 535. Argued March 4, 1942.—Decided April 13, 1942.

---

*Messrs. Howell Leuck* and *H. Russell Bishop,* with whom *Messrs. H. D. Driscoll* and *Bingham W. Zellmer* were on the brief, for appellants.

*Mr. James C. Wilson,* with whom *Solicitor General Fahy, Assistant Attorney General Arnold,* and *Messrs. Smith R. Brittingham, Jr., Daniel W. Knowlton,* and *E. M. Reidy* were on the brief, for appellees.

MR. JUSTICE JACKSON delivered the opinion of the Court.

This appeal is from a judgment of a statutory three-judge court denying appellants' petition to set aside an order of the Interstate Commerce Commission refusing the Gregg Cartage & Storage Company a certificate of public convenience and necessity under the so-called grandfather clause of § 206 (a) of the Motor Carrier Act, 1935, 49 U. S. C. § 306 (a).

The Gregg Company, an Ohio corporation, operated in 1935 and earlier as a common carrier of general freight between points in several northeastern states. In a number of important cities, it maintained terminals at which freight was assembled. It performed no over-the-road carrier service with its own vehicles, but provided such service entirely by the use of so-called owner-operator vehicles. Such vehicles as it owned and operated directly were used in cartage in and about Cleveland.

On February 12, 1936, the Gregg Company filed an application with the Interstate Commerce Commission for a certificate of public convenience and necessity as a common carrier under the grandfather clause of § 206 (a) of the Motor Carrier Act. A hearing was held on June 8 and 9, 1937, before an examiner who, on December 17, 1937, recommended that the certificate be granted.

Meanwhile, the Gregg Company had failed and ceased to operate. It had arranged the filing on October 4, 1937, of a creditor's bill in a state court of Ohio, which on the following day appointed the company's counsel to be its receiver with authority to continue the business. On the day of this receiver's appointment, other creditors filed a petition in bankruptcy in the United States District Court for the Northern District of Ohio, Eastern Division, which on October 27 adjudicated the company a bankrupt, and on October 30 appointed a receiver to preserve the assets of the estate pending the election and qualification of a trustee.[1] In operating the business, the state court receiver confined himself to the completion of shipments en route, and did not solicit or accept new business. On October 14, he filed with the Commission a petition for permission to suspend operations without prejudice to rights under the grandfather clause. The

[1] The trustee in bankruptcy, an appellant here, was appointed near the end of December, 1937.

Commission, of the opinion that it lacked power to authorize such a suspension, denied this petition on November 30, 1937. The receiver in bankruptcy took over the business on the day of his appointment, and conducted no operations at any time. Pursuant to an order of the bankruptcy court, on December 6, 1937, he sold the trade names and good will of the bankrupt estate, together with its rights under the grandfather clause application, to appellant Northeastern Transportation Company, for $850 at public auction.

On January 7, 1938, Northeastern and the receiver in bankruptcy filed a joint application with the Commission asking that Northeastern be substituted as applicant in lieu of Gregg. The Commission withheld action until it had determined Gregg's rights. Northeastern considered a resumption of operations, but decided against it on the advice of field representatives of the Interstate Commerce Commission.

A further hearing before another examiner, confined to the circumstances of the interruption of Gregg's service, resulted in another recommendation of the issuance of a certificate under the grandfather clause. The Commission, however, denied the application December 12, 1939, after a rehearing following the report of Division 5, a majority of which had held similarly on November 14, 1938. 10 M. C. C. 255, 21 M. C. C. 17. The Commission ruled that an interruption of service within the control of the applicant had occurred, that the purchase by Northeastern had conferred no operating rights, and that therefore neither corporation was entitled to a certificate under the grandfather clause. Five commissioners dissented. Gregg and its trustee in bankruptcy then filed a complaint in the United States District Court for the Northern District of Ohio, Eastern Division, praying that the order of the Commission denying Gregg's application be annulled and set aside and that the Commission be directed

to issue a certificate of public convenience and necessity to Gregg. A statutory court of three judges was convened, Northeastern was allowed to intervene, and judgment went against the complainants, who appealed to this Court, which noted probable jurisdiction.[2]    42 F. Supp. 266.

Appellants contend that the Commission and the court below erroneously construed § 206 (a)[3] of the Motor Carrier Act in holding that, excepting the specified interruptions of service, the statute required continuous operation from June 1, 1935, until the hearing by the Commission on the application. We have, however, held to the contrary. *United States* v. *Maher,* 307 U. S. 148, petition for limited rehearing denied, 307 U. S. 649. *Hoey* v. *United States,* 308 U. S. 510; *Lubetich* v. *United States,* 315 U. S. 57.

Appellants contend alternatively that the Commission should be reversed for refusing to hold that the applicant "had no control" over the cessation of operations.

From October 15, 1935 to December 31, 1936, Gregg was insured against public liability and property damage by an insurance company, which in 1936 failed either to disprove or settle certain claims against Gregg and was rumored to be insolvent. For these reasons Gregg cancelled its contract with this company and obtained similar insurance with another company, paying the premiums in advance. The failing insurance company was adjudged a bankrupt in January of 1937, and ceased to pay any

---

[2] Urgent Deficiencies Act of October 22, 1913, 28 U. S. C. § 47a.

[3] This provides in pertinent part that: "if any such carrier or predecessor in interest was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, . . . except . . . as to interruptions of service over which the applicant or its predecessor in interest had no control, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation." 49 U. S. C., § 306 (a).

claims. Gregg, thereby left with the burden of satisfying claims for personal injury and property damage arising during the period when it had carried insurance in the bankrupt company, paid some of them in the later months of 1937; but approximately 175, estimated to aggregate in their face amount about $200,000, remained unpaid. It also paid about $15,000 on claims for cargo loss and damage, which two other insurers, relying upon "technical" insurers' defenses, refused to pay. All policies of insurance taken out by Gregg had the required approval of the Interstate Commerce Commission.

Solvent on June 30, 1937, Gregg had become insolvent by October 30, 1937. When it appeared impossible to satisfy all demands in full, resort was had to the friendly receivership in the state court. This precipitated the involuntary bankruptcy in the federal court, which in turn brought operations to a halt.

The Commission based its refusal to find that the applicant "had *no* control" over the interruption of service upon the fact that such interruption followed upon an adjudication of bankruptcy resulting from the unsuccessful conduct of its business affairs, and did not go back of the adjudication to find and give detailed consideration to the particular causes of the failure. Appellants contend that this was error, and for a rule requiring that in every case of this sort the Commission must trace out the chain of causation and weigh the bankrupt's judgment against the pressures of circumstance. We sustain the Commission in construing the statute as not requiring it to go back of the bankruptcy adjudication to search for ultimate causes.

How far one by an exercise of free will may determine his general destiny or his course in a particular matter and how far he is the toy of circumstance has been debated through the ages by theologians, philosophers, and scientists. Whatever doubts they have entertained as to the

80

matter, the practical business of government and adminis-
tration of the law is obliged to proceed on more or less
rough and ready judgments based on the assumption that
mature and rational persons are in control of their own
conduct. Certainly that assumption must be made in
reference to a corporation such as the applicant. Society,
in creating a corporation, vesting its management in a
board of directors, granting it large powers and not incon-
siderable immunities, can hardly allow that its business
affairs are at any time out of the control of those whose
duty it is to conduct them. The Bankruptcy Act states
that even an involuntary adjudication results only from
some "act of bankruptcy," defined upon the clear assump-
tion that it is within the bankrupt's control.[4] Whether
or not this assumption squares with philosophical doc-
trine, or even with reality,[5] is not for our determination.
The Commission, and the courts too, must get on with the
application of the federal statutes without waiting to
settle the verity of the philosophical assumptions on which
they rest.

The Commission was warranted in holding as matter of
law that the interruption because of bankruptcy was not
one over which the applicant had no control within the
meaning of the Motor Carrier Act. The complexity of the
chain of causation shown in this case makes it an apt
illustration of the impracticability of any other rule.

---

[4] The following are defined as acts of bankruptcy: (1) fraudulent
conveyances or concealments of property, (2) transfers while insol-
vent, (3) permitting, while insolvent, a creditor's lien to attach to
property through legal proceedings, (4) assignments for the benefit
of creditors, (5) permitting or procuring, while insolvent in either
the bankruptcy or equity sense, a receiver to be appointed to take
charge of the bankrupt's property, (6) admissions in writing of in-
ability to pay debts and of willingness to be adjudged a bankrupt.
§ 3a of the Act of July 1, 1898, as amended, 11 U. S. C. § 21 (a).

[5] Treiman, Acts of Bankruptcy: A Medieval Concept in Modern
Bankruptcy Law, 52 Harvard Law Review 189.

When it found itself unable to meet its obligations, Gregg arranged a receivership in the state court, securing the appointment of its own counsel as receiver. Only the one creditor which filed the bill appears to have been consulted. Thus, the petitioner not only arranged deliberately to commit an act of bankruptcy, but it managed the affair in a manner not unlikely to provoke the unconsulted creditors to file a petition in bankruptcy—presumably considered their best or only means of obtaining the disinterestedness in the administration of the estate to which they were entitled.

The claims which, together with the advance payment of premiums for new insurance, constituted the immediate cause of Gregg's financial difficulties, were, as we have said, of various sorts. Bulking largest were those for personal injuries and property damage, which numbered approximately 175 and in their face amount aggregated approximately $200,000. Their precise nature is not disclosed by the record, and conjecture in this regard is made particularly difficult by Gregg's method of doing business—which was to avail itself entirely of "owner-operator" vehicles for its "over-the-road" services. Doubtless these claims were founded almost entirely upon the negligent operation of vehicles for which Gregg was in some way held legally responsible. We are not informed whether such responsibility rested upon the principle of *respondeat superior,* express contractual assumption, or both. The rest of the claims, upon which about $15,000 were paid, were for cargo loss and damage. The record does not show whether payment was made solely to retain the good will of shippers, or also to satisfy the applicant's legal liability—which would have rested upon its legal control of the cargo.

It is true that Gregg would not have had to bear the burden of most, if not all, of the claims, had it not been for

some unfortunate experiences with insurance companies. Its major misfortune was the failure of the company in which it carried its insurance against liability for personal injury and property damage. What consideration actuated the choice of the particular insurance company, and what caution, if any, was observed in selecting it, do not appear. It either misunderstood the coverage of its other policies or purchased policies not specifically comprehensive, and found itself taking care of very substantial claims for cargo loss because of "technical" insurers' defenses which seem to have been sufficient under the Ohio law.

In any event, the choices of insurers, as well of its servants and operators, were Gregg's own—as was the judgment which was exercised with regard to the numerous other phases of its business bearing upon its solvency—and the final product could not have been a matter over which it had *no* control.

Furthermore, the interruption of service was the deliberate act of those who for the time being stood in the position of applicant and owned its rights. During the interval between receivership and sale of these rights to Northeastern, we take it that the beneficial interest therein vested in the creditors and the legal title in the receiver or trustee. The federal receiver or trustee could have been authorized to conduct the business of the bankrupt for a limited period, if in the best interests of the estate. § 2 of the Act of July 1, 1898, as amended, 11 U. S. C. § 11. The creditors and their representatives, however, failed to seek such authority, evidently regarding the rights, which later sold for $850, not worth the expense and risk of continuing business. It is the purchaser Northeastern, organized to acquire the "grandfather" rights, and to an undetermined extent identified with the management of the bankrupt,[6] which, having bought these rights in this

---

[6] The Commission found that Northeastern was incorporated to take over the bankrupt's rights and business, that the former president

state of voluntarily suspended animation, seeks to revive them. But it cannot say that it takes the rights free of any impairment by the voluntary suspension of operation by the then owner from whom it derives title.

The applicant for a certificate under the grandfather clause seeks to exempt his further operations from scrutiny as to public convenience and necessity. If he is able to meet those tests, he may be authorized to operate, even if he never had grandfather rights, or if those he once had have been lost. As the Motor Carrier Act is remedial, and the grandfather clause confers a special privilege, the proviso defining exemptions is to be held to extend only to carriers plainly within its terms. *McDonald* v. *Thompson,* 305 U. S. 263, 266.

In its opinion the Commission stated that "it is useless to speculate upon the question whether the 'grandfather' right expired before or after the sale." This we understand to mean that, having determined that the cessation of operations was not a matter over which Gregg "had no control," the Commission was of opinion that by the time of the sale the cessation of operations was of sufficient duration—at least 69 days—to establish that Gregg had not been "in . . . operation since" June 1, 1935, within the meaning of § 206 (a). This was a reasonable conclusion, especially since any substantial interruption of one carrier's service tends to result in expansion of other facilities to meet the continuing needs of shippers, and thus to cause overcrowding if the suspended service is resumed.

Finally, appellants claim to be entitled to relief from prejudice said to have resulted from delay of the Commission in acting on Gregg's application made under § 206

of Gregg is the new company's general freight agent, and the former superintendent of transportation is a stockholder of the new company; and that "other connections, if any, between the companies through their respective officials and employees cannot be determined from the records."

(a) on February 12, 1936. They point out that, had the Commission acted at once, a certificate would have issued, thus conferring the benefits of § 212 (a).[7] But by its terms § 212 (a) is applicable only where a certificate has already issued; and, being a section of general applicability, at least for present purposes, it has no analogical bearing upon the construction of the specific provision relating to interruptions of service made in § 206 (a). The delay in passing upon the application was considerable and regrettable, as the Commission acknowledged, but it does not seem to have been arbitrary or the result of any deliberate discrimination, nor, in view of the magnitude of the Commission's task, unreasonable. The Commission had nearly 90,000 applications to pass upon under § 206 (a), and of course could not have been expected to pass upon them simultaneously. It is not within our province to remedy inequalities necessarily incident to the administration of the statute.

*Affirmed.*

MR. JUSTICE DOUGLAS, dissenting:

I cannot believe that experts of the subject—say, referees charged with the duties of administering the bankruptcy law—would conclude that every bankruptcy arose without exception from conditions which were with-

---

[7] This reads in part as follows: "That no such certificate, permit, or license shall be revoked (except upon application of the holder) unless the holder thereof willfully fails to comply, within a reasonable time, not less than thirty days, to be fixed by the Commission, with a lawful order of the Commission, made as provided in section 204 (d), commanding obedience to the provision of this part, or to the rule or regulation of the Commission thereunder, or to the term, condition, or limitation of such certificate, permit, or license, found by the Commission to have been violated by such holder." 49 U. S. C. § 312 (a).

Originally the period was 90 days. By an amendment of June 29, 1938, 52 Stat. 1239, it was reduced to the present 30 days.

in the "control" of the bankrupt in any accepted meaning of the word. Nor do I think that that view would be taken in case of receiverships. Yet that is the irrebuttable presumption which the Commission has created in this type of case. Congress did not create it. Congress merely provided that this class of carrier had a right to the statutory grant on a showing, *inter alia,* that it was in "bona fide operation as a common carrier by motor vehicle on June 1, 1935" and "has .so operated since that time" except as to "interruptions of service over which the applicant or its predecessor in interest had no control." Motor Carrier Act of 1935, § 206 (a); 49 U. S. C. § 306 (a). I would have supposed that the question of "control" was "an issue of fact to be determined by the special circumstances of each case." *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 145. That would mean that "So long as there is warrant in the record for the judgment of the expert. body it must stand." *Id.* pp. 145–146. But that is quite different from giving the word "control" a construction which prevents a person from showing under any circumstances that the events which led to his business disaster were not subject to his "control." On the one hand, the Commission rules that interruptions of service owing to floods,[1] snow,[2] unsafe[3] or impassable[4] roads, highway construction,[5] droughts which destroy a carrier's chief source of business,[6] ill health,[7] strikes,[8] or the illegal action of govern-

---

[1] Waltz Transportation, Inc., 10 M. C. C. 30, 33.

[2] Lewis McKay, 4 M. C. C. 93, 94.

[3] Edwards Motor Transit Co., Inc., 2 M. C. C. 73, 74.

[4] Inter-Carolinas Motor Bus Co., 21 M. C. C. 633, 635; Walter Stages, Inc., 24 M. C. C. 451, 454.

[5] Magee Truck Lines, Inc., 28 M. C. C. 386, 389.

[6] Barnes Truck Co., Inc., 24 M. C. C. 465, 467.

[7] H. Bruce Blackburn, 20 M. C. C. 747, 748–749.

[8] Motor Freight Express, 26 M. C. C. 374, 375; Transamerican Freight Lines, Inc., 28 M. C. C. 493, 502.

mental authorities [9] constitute grounds for holding that an interruption of service is beyond an applicant's "control." But similar misfortunes of a purely accidental character which affect financial stability and end in bankruptcy or receivership are held as a matter of law to be subject to the carrier's "control."

The distortion which that interpretation involves is well illustrated by this case. There was evidence tending to show the following: During the year 1936 the applicant was insured against public liability and property damage by the Central Mutual Insurance Co. Hearing rumors that Central Mutual was in financial difficulties and was not paying claims, applicant dropped its policy in December 1936 and placed its insurance with another company. On January 11, 1937, Central Mutual was adjudged a bankrupt and ceased payment of all claims. In the fall of 1937, applicant was forced to pay several substantial damage claims arising from accidents during the period when its insurance policy was in effect with Central Mutual. These payments seriously impaired its working capital. Furthermore, applicant was confronted with approximately 175 additional claims for personal injury and property damage. These were estimated at about $200,000 and arose during the period when applicant was insured by Central Mutual. Applicant settled some of these claims. It was impossible, however, to satisfy the demands of all of these claimants. Receivership followed and on its heels came bankruptcy. There is not the slightest evidence in this record of any negligence, dereliction, or mismanagement on the part of applicant. It is undisputed that its failure was due to the failure of its insurer. And there is no evidence in this record that it did not exercise due care in the selection of that insurer. It would indeed be ironical to cast a

---

[9] W. H. Tompkins Co., 29 M. C. C. 359, 362.

presumption against the applicant on that score when the insurance policy presumably was accepted by the Commission, and under its regulations promulgated pursuant to §§ 211 (c) and 215 of the Act (49 U. S. C. §§ 311 (c) and 315) had to be "approved" by it.[10]   Federal Register (1936) Vol. 1, p. 1163, Rule 1.   And see 49 Code of Federal Regulations, Pt. 174, § 174.1.

An applicant carries the burden of establishing his right to the statutory grant which is contained in the "grandfather" clause.   *Alton R. Co.* v. *United States,* 315 U. S. 15.   But he should not be met at the threshold with a conclusive presumption against him, unless Congress has clearly indicated that in the circumstances of his case he has no right even to undertake the burden of proof. If Congress had desired to eliminate all applicants whose continuous service was interrupted by bankruptcy or receivership, I believe it would have said so.   As stated by Commissioner Lee in his dissenting opinion (10 M. C. C. p. 263): "If such interruptions in service are to be construed as putting an end to 'grandfather' rights of carriers, whose applications therefor have not been determined, then, where such a carrier goes into receivership or bankruptcy, and such an interruption occurs, it would be impossible for the carrier to come out of receivership and resume operations; it could not effect a composition or an arrangement with its creditors and resume operations; if a corporation, it could not be reorganized under the corporate reorganization provisions of the Bankruptcy Act, and creditors could realize nothing from 'grandfather' rights, however valuable."   Such a wholesale destruction of operating rights should not be readily or lightly inferred.   Operating rights are the very life of any business. Without them this business certainly has no more than scrap value.

---

[10] And see Federal Register, *op. cit.,* Rule IX; 49 Code of Federal Regulations, Pt. 174, § 174.9.

Great deference is owed a commission's interpretation of the law which it enforces, especially where the meaning of the statutory language, generally or in specific application, gains body and flavor from the content of the highly specialized field in which the expert body works. See *Shields* v. *Utah Idaho Central R. Co.,* 305 U. S. 177; *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381; *Gray* v. *Powell,* 314 U. S. 402; *Alton R. Co.* v. *United States, supra.* But that is quite different from acceding to the suggestion that the non-technical word "control" may be interpreted in a way which goes against all human experience and which does violence to its ordinary and accepted meaning. In this connection it should be noted that, if the misfortune which ended in bankruptcy or receivership was not subject to the carrier's "control," then an interruption of service made by the trustee or receiver cannot be attributed to him. Once the court acquires jurisdiction over the estate, the affairs of the business are in its hands, not the debtor's.

Congress has provided that those who attained a position in the competitive transportation system should be allowed to retain the fruits of their struggle. Whether that policy was wise or unwise is not for us to appraise. But we should not permit those statutory grants to be whittled away on the basis of technical and legalistic grounds which find no expression in the statute, however much the administrative chore may be alleviated. If the services of a carrier have been interrupted by bankruptcy or receivership, his burden of proving that that default was not subject to his "control" may be onerous. Perhaps in most cases he could not maintain it. But he should be given the opportunity to do so. It is hard for me to imagine a clearer case where he probably could succeed than this one. Yet before we passed on that issue, as the opinion of the Court undertakes to do, we should remand the case to the Commission. For it made

no findings on that issue but invoked an irrebuttable presumption which would automatically foreclose in all cases an opportunity to be heard on the real cause of the bankruptcy or receivership.

MR. JUSTICE BLACK and MR. JUSTICE BYRNES join in this dissent.