SHAWMUT TRANSP. CO., Inc., v. INTER-
STATE COMMERCE COMMISSION
et al.

Civil Action No. 2198.

District Court, D. Massachusetts.

April 6, 1943.

James J. Weinstein, of Boston, Mass., for plaintiff.

Edmund J. Brandon, U. S. Atty., and George F. Garrity, Asst. U. S. Atty., both of Boston, Mass., Thurman Arnold, Asst. Atty. Gen., Edward Dumbauld, Sp. Asst. to Atty. Gen., and E. M. Reidy, Asst. Chief Counsel, Interstate Commerce Commission, Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, Thurman Arnold, and Edward Dumbauld, all of Washington, D. C., and Edmund J. Brandon and George F. Garrity, both of Boston, Mass., for defendant.

Before WOODBURY, Circuit Judge, and FORD and HEALEY, District Judges.

WOODBURY, Circuit Judge.

Jurisdiction of this court is invoked under 28 U.S.C.A. § 41(28) and Secs. 43–48 in an action to enjoin the enforcement of and to set aside an order of the Interstate Commerce Commission dated August 7, 1942, in so far as the Commission by that order refused to issue a certificate of public convenience and necessity to the plaintiff entitling it to continue over the road operations in interstate commerce by motor vehicle between Boston and New Bedford, Mass., and environs, on the one hand, and Philadelphia, Pa., and environs, on the other.

At the hearing before us on February 19, 1943, the Commission, by its attorney, agreed to stay the effective date of its order until March 15, 1943, and to extend that stay further if necessary. (The stay was subsequently extended to May 1, 1943.) The plaintiff thereupon withdrew its application for an interlocutory injunction and the case was submitted for final determination on the transcript of the testimony and the exhibits which constituted the evidence before the Commission and upon which it based the order which we are asked to review.

The essential facts are not in dispute. The sole question presented is as to their legal effect.

The plaintiff, Shawmut Transportation Co., Inc., which for convenience will be referred to hereinafter as Shawmut, a Massachusetts corporation, is a common carrier by motor vehicle which has been authorized by the Interstate Commerce Commission to continue its operations between points

in eastern Massachusetts and points in the vicinity of New York, N. Y., it having seasonably filed an application therefor under the "grandfather" clause of Sec. 206(a) of the Motor Carrier Act, 1935, 49 Stat. 543, now, as amended, Sec. 306(a) of Part II of the Interstate Commerce Act (49 U.S.C.A. § 301 et seq.). Shawmut does not claim the right to operate as far as Philadelphia under this authority. It claims the right to operate to Philadelphia and environs by reason of its purchase of the operating rights of another carrier, the Topsfield Express Co., Inc., which hereinafter we shall refer to simply as Topsfield.

This corporation, which had its principal place of business in Somerville, Mass., seasonably applied to the Commission under the "grandfather" clause above for a certificate of public convenience and necessity authorizing it to continue its operations as a common carrier by motor vehicle between Boston, Mass., and Philadelphia, Pa., over regular routes and with service to all intermediate points and some off-route points. After filing this application Topsfield became involved in financial difficulties and on July 27, 1937, it filed a petition in the United States District Court for the District of Massachusetts asking for reorganization under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. This petition was approved on the day it was filed, and the court, on the same day, authorized the debtor to continue in the possession of its property and in the operation of its business. It so continued.

Approximately six months later, specifically on February 12, 1938, the Interstate Commerce Commission, a hearing having been held, issued a compliance order in which it found that on June 1, 1935, and since, Topsfield had been in bona fide operation as a common carrier in the manner specified in its application for a certificate under the "grandfather" clause, and ordered that, upon compliance with the Motor Carrier Act and the Commission's regulations as to the publication of its rates and the filing of evidence of security for the protection of the public, a "certificate of public convenience and necessity shall be issued, unless otherwise ordered, authorizing said applicant to engage in interstate or foreign commerce as a common carrier by motor vehicle", according to its application. Protests were filed with the Commission, however, and a second hearing was held on Topsfield's application. As a result a second compliance order, dated January 16,

1939, was issued confirming the rights given to Topsfield by the earlier compliance order, except as to some off-route points.

During the first months of 1939, Topsfield's business declined rapidly and in mid April of that year all of its equipment used in hauling freight between its terminals in Somerville, Mass., and Newark, N. J., was repossessed by financing companies. From this time on, however, it continued to solicit line-haul shipments between its terminals. To transport these shipments it employed other carriers; its shipments moving under its billing and at its tariff rates. The Commission found the evidence "convincing" that Topsfield's operations were conducted continuously to May 6, 1939, the date upon which its receiver in bankruptcy discontinued operations as will appear hereafter.

This was the situation when, on April 17, 1939, Topsfield filed a petition in the district court for revocation of the confirmation of its plan for reorganization under 77B, which it had previously filed and which had been confirmed, and for an order for liquidation or dismissal. Order of notice issued on this petition, and on May 2, 1939, a hearing was held, confirmation of the plan was revoked, the court determined that Topsfield was insolvent, entered an order for liquidation, and referred the matter to the referee. On the day following all papers were forwarded to the referee and he, on the same day, appointed a receiver, giving him power to operate the bankrupt's business. Immediately upon appointment, in fact the evidence is that within a few hours of that time, the receiver petitioned the court for leave to sell the assets of the bankrupt, including its operating rights. And on May 5, 1939, the receiver, as he said in his testimony, "to clarify the record", petitioned the court for more specific leave to continue to operate the bankrupt's business. In this petition he recited: "That your Receiver has filed with this Court a Petition for Leave to Sell certain assets of the above named corporation, among which there is a trucking franchise certificate issued by the Interstate Commerce Commission; that your Receiver has been informed, and therefore believes and avers that unless said trucking service is operated daily, the so-called franchise will become invalid; that your Receiver has also filed with this Court in lieu of an immediate sale a Petition for Leave to Lease said franchise certificate;

that pending the consummation of any possible sale it is necessary that the said trucking service be operated daily."

On the same day, after hearing, the court "Ordered, adjudged and decreed that Hyman Copins, Receiver, be allowed to operate said business for such time as is necessary to keep said franchise alive, before a possible sale." Pursuant to this order and the order to operate the bankrupt's business contained in his appointment, the receiver operated Topsfield's business from May 3, 1939, the date when he was appointed, through Saturday, May 6, 1939.

The receiver discontinued operations on May 6 for the reason that on the following Monday, May 8, he sold Topsfield's operating rights and other assets to a New Jersey corporation, one of the conditions of the sale being that the purchaser was to assume operations and continue operating in such a way that Topsfield's rights would not be prejudiced. This purchaser defaulted, however—four days after the sale the checks which it gave for part of the purchase price of the rights were returned marked "insufficient funds"—and, with the approval of the referee, the receiver revoked the sale. On this same day, May 12, 1939, the receiver sold Topsfield's operating rights to Shawmut, with the same condition as to the protection of those rights by the purchaser, and Shawmut at once, as the Commission found, "endeavored to lawfully resume the operations." The receiver and the attorney for Shawmut went to Washington on May 13, in an attempt to obtain immediate approval of the transfer, but were unsuccessful, and on May 22,[1] Shawmut filed an application to lease Topsfield's operating rights pending approval of its application to be submitted for Topsfield on the latter's application for a certificate of public convenience and necessity. On May 26, 1939, Shawmut and Topsfield's receiver filed a joint application with the Commission asking that Shawmut be substituted as applicant in lieu of Topsfield.

On July 8, 1939, the Commission notified Shawmut that it had been granted authority to lease Topsfield's rights for 180 days beginning July 18, and on that date Shawmut began operations between Boston and Philadelphia—it having obtained a temporary lease from Topsfield's receiver—and continuously ever since Shawmut has operated over the routes and served the territory authorized to be served by the order of January 16, 1939. On November 15, 1939, a hearing having been held, the Commission cancelled the temporary lease, and authorized the purchase by Shawmut of Topsfield's operating rights, "including the right to a certificate covering rights confirmed in No. MC-76226,[2] herein authorized to be unified with rights as may otherwise be confirmed in applicant, with duplications eliminated," and approved the substitution of Shawmut as applicant in lieu of Topsfield.

After Shawmut had been operating to Philadelphia under the above orders for nearly a year,[3] the Commission, without notice, issued an order on July 10, 1940, in the following language:

"Upon consideration of the record in the above-entitled proceeding, and good cause appearing therefor;

"*It is ordered,* That the orders of February 12, 1938, and January 16, 1939, issued to Topsfield Express Company, a corporation, under Docket No. MC 76226 and since transferred to the above applicant and assigned the Docket Number shown above pursuant to MC–F 921, be, and they are, hereby vacated and set aside."

Upon receipt of this order Shawmut's attorney wrote to the Commission requesting the reason for its action and on August 12, 1940, the Commission replied stating: "Please be advised that the basis for the vacation order was to allow the operating rights of the carrier to be fully determined and whether or not there has been a cessation of operations which has amounted to an abandonment of operations and, therefore, a forfeiture of the transferor's rights through non-operation." A hearing was thereafter held in Boston before an examiner for the Commission who reported

---

[1] Counsel for Shawmut contends that even in the exercise of the greatest diligence and expedition it took ten days to prepare the profit and loss statements and balance sheets of both the bankrupt vendor and the purchaser for the two and a half year period next preceding the filing of the application; data which at that time were required to be filed with the Commission in connection with applications to purchase or lease.

[2] This is the Commission's docket number for the application originally filed by Topsfield for a certificate of public convenience and necessity.

[3] In its complaint in the action before us Shawmut alleges that during this period it "expanded its facilities and service to Philadelphia, Pa., with great effort and substantial investment."

834

that between May 12 and July 18, 1939, Shawmut did not operate to Philadelphia under the authority given to Topsfield by the Commission's orders of January 16, 1939, "because it was aware of the fact that to do so without first having obtained approval would be (in) contravention of the Commission's rules and regulations." The examiner then went on to say: "During this period applicant was faced with a situation where it could neither legally operate nor control the circumstances. Under the circumstances of this case, the examiner concludes the interruption of service during this period was due to causes beyond applicant's control." But the examiner, after considering the evidence as to the extent of Topsfield's operations, concluded: "It is clear that the evidence does not warrant a grant of authority to serve Philadelphia." On the basis of the foregoing he recommended an order granting Shawmut, on Topsfield's original application, a certificate permitting it to operate only as far as Newark, where Topsfield had maintained its southern terminal, but not beyond.

The conclusions of the Commission in its order of August 7, 1942, part of which we are asked to enjoin and set aside, differ from those reached by the examiner. The Commission affirmed the examiner by finding that Shawmut "did not operate between May 12 and July 18, because it was aware of the fact that to do so without first having obtained approval would be unlawful", but then it went on to say:

"As the sale of the operating rights to applicant could not be fully consummated until authorized by the Commission, it is clear that the receiver could have lawfully, and should have, continued the operations until July 18, 1939, at which time applicant could lawfully have taken over and conducted such operations. Moreover, it was not beyond the parties to provide in the contract of sale and purchase that the receiver should continue to operate the business until applicant had obtained appropriate authority from this Commission to acquire the claimed rights. In the light of these circumstances, it is obvious that the interruption in service was not one over which applicant and its predecessor had no control, within the meaning of section 206 (a) of the act. Such interruptions are a bar to the claimed 'grandfather' rights. Gregg Cartage & Storage Co. Common Carrier Application, 21 M.C.C. 17, affirmed by the Supreme Court in Gregg Cartage &

Storage Co. v. United States, 316 U.S. 74 [62 S.Ct. 932, 86 L.Ed. 1283]. These decisions must be controlling here.

"Applicant has not, therefore, established that its predecessor was in bona fide operation on June 1, 1935, and that it and its predecessor have continuously so operated since that time as a common carrier by motor vehicle of general commodities from and to the described points. The application herein will be denied.

"In view of these conclusions, it is unnecessary to consider the evidence adduced in support of the claimed rights."

Giving due deference to the Commission's interpretation of the law which it enforces, still we are of the opinion that the conclusion which it reached on the facts before it in this case is erroneous.

The Motor Carrier Act, 1935, 49 Stat. 543, as amended, by its section 206(a), 49 U.S.C.A. § 306(a), forbids, with exceptions not here material, common carriers by motor vehicle subject to its provisions from engaging in any operations in interstate or foreign commerce over any highway in the United States "unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations." But the section then goes on to provide, and this is the so-called "grandfather" clause, that "if any such carrier or predecessor in interest was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, * * * except * * * as to interruptions of service over which the applicant or its predecessor in interest had no control, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate was made to the Commission as provided in paragraph (b) of this section * * *."

That is to say, under the "grandfather" clause the Commission must issue to any common carrier, subject to the provisions of the Act, a certificate of public convenience and necessity authorizing it to operate in interstate commerce over the highways without proof that public convenience and necessity will be served by such operations if that carrier, or its predecessor in interest, was in bona fide operation as such on June

1, 1935, "over the route or routes or within the territory for which application is made" and if it "has so operated since that time, except \* \* \* as to interruptions of service over which the applicant or its predecessor in interest had no control."

Turning now to the facts as found by the Commission, it appears that Shawmut's predecessor in interest, Topsfield, was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, and that it, and its receiver who was duly authorized, continued those operations through Saturday, May 6, 1939. Then followed a hiatus in operations until July 18, 1939, when Shawmut, having leased Topsfield's operating rights, and that lease having been approved by the Commission, resumed operations, which it has since uninterruptedly continued. The question is whether this interruption of service was one over which Shawmut or its predecessors in interest had no control.

At the oral argument before us, counsel for the Commission conceded (counsel for the United States voicing no objection) that the interruption of service from May 6 to May 12 was not one of a nature to cut off or destroy the "grandfather" rights claimed by Shawmut. And, as we understand the arguments made before us and the opinion of the Commission, we take it that it is not contended that the interruption of service from May 12 to July 18 was one within the control of Shawmut itself. At any rate, it seems to us too clear to require supporting argument that an interruption of service for a period of time, because of knowledge that to operate during that period would be illegal, is not, in fairness and reason, one which can be said to be an interruption over which the carrier had control.[4] In short, we agree with the examiner's conclusion that the interruption of service during this period was due to causes beyond the applicant's (Shawmut's) control. We do not understand that the Commission disagrees with the examiner on this. As we understand the opinion of the Commission it holds that the interruption of service was one over which Shawmut's predecessor in interest, Topsfield's receiver, had control, and therefore that it was one which under the statute terminated the "grandfather" rights purchased by Shawmut. This is the precise question to which we shall address our attention.

Since the Commission found that Topsfield, until it was adjudicated a bankrupt, and thereafter its receiver, acting under proper authority, had operated continuously from a time prior to June 1, 1935, to the Saturday before the Monday upon which Topsfield's operating rights were first sold, it would seem that there had been no interruption at all in the service given by Shawmut's predecessors in interest.[5] However, the Commission concluded, obviously on the authority of Gregg Cartage & Storage Co. v. United States, 316 U.S. 74, 62 S.Ct. 932, 934, 86 L.Ed. 1283, that an interruption of service within the control of Shawmut's predecessor in interest had occurred for the reason that the receiver had failed to operate during the interval which elapsed between the date of his first sale of Topsfield's rights and the date when Shawmut as purchaser was authorized by the Commission to commence operations. We do not think that either the statute or the case last cited support this conclusion.

■■ Viewing the act as a whole, it is obvious that Congress intended to permit the sale of rights acquired under the "grandfather" clause. But, equally obviously, it did not intend to permit a purchaser of such rights to operate under them until the purchase had received the approval of the Commission, and this approval, Congress must have realized, would necessarily take some time. It must have appreciated that time would be required to prepare and file the financial data which the Commission would need in order to pass intelligently upon such an application, and it must also have realized that even after filing this data there would necessarily be unavoidable and indefinite delays, due to crowded dockets and other factors, before the Commission would be able to make a study of it and render its decision. In addition to the foregoing, Congress must have also appreciated that there would be many instances in which "grandfather" rights, valuable in themselves, would be sold because the seller, for some reason or an-

---

[4] We do not intend by this remark to express any opinion on the situation presented when a carrier's operations are interrupted for a time because the Commission has suspended a certificate, permit or license which it has previously issued to the carrier.

[5] The first purchaser, who defaulted, was obviously not a predecessor in interest of Shawmut.

other, could not possibly operate under them any longer, maybe, as in the case at bar, not even long enough to give time for the Commission to act on the buyer's application to purchase.[6] Congress must have had in mind sales forced by an operator's sudden illness, financial reverses, or loss of vehicles by fire or other casualty, for instance, and we cannot believe that it intended its words to be so construed as to destroy the value of operating rights sold for such reasons, which would be the necessary consequence of the decision of the Commission in this case.

Nor do we think that the Gregg Cartage case supports the Commission's conclusion. The facts of that case differ in important respects from the facts in the case at bar and we do not believe that anything said by the Court in that opinion was intended·to apply to the situation presented here.

Briefly stated the facts under consideration by the Supreme Court in the Gregg Cartage case are these:

Early in October, 1937, the Gregg Cartage Co. failed and ceased to operate and on October 27 and 30 of that year, respectively, it was adjudicated a bankrupt and a receiver was appointed. This receiver never operated and never asked for authority to operate. On December 6, 1937, acting under authority of the court which appointed him, the receiver sold the bankrupt's rights under its "grandfather" clause application to a corporation which the court said was "organized to acquire the 'grandfather' rights", and which was "to an undetermined extent identified with the management of the bankrupt." A month later, on January 7, 1938, the purchaser and the receiver filed a joint application with the Commission asking that the purchaser be substituted as applicant for the "grandfather" rights in lieu of Gregg, but this application was denied by the Commission on the ground that there had occurred an interruption of service within the control of the applicant or its predecessor in interest. The Supreme Court stated the issue before it in this case as follows: "The Commission based its refusal to find that the applicant 'had *no* control' over the

interruption of service upon the fact that such interruption followed upon an adjudication of bankruptcy resulting from the unsuccessful conduct of its business affairs, and did not go back of the adjudication to find and give detailed consideration to the particular causes of the failure. Appellants contend that this was error, and for a rule requiring that in every case of this sort the Commission must trace out the chain of causation and weigh the bankrupt's judgment against the pressures of circumstance." On the above facts the court sustained the Commission in construing the statute as not requiring it to go back of the adjudication in bankruptcy in search for ultimate causes. The Court summarized its holding by saying: "The Commission was warranted in holding as matter of law that the interruption because of bankruptcy was not one over which the applicant had no control within the meaning of the Motor Carrier Act."

Clearly the question actually decided by the Court in the Gregg case is not the question before us here, and we think that the Court in its opinion in that case was careful to limit the application of the remarks which it made in reaching its decision to the factual situation before it. In the Gregg Cartage case the carrier was not operating and it had not been operating for some three weeks when it was adjudicated a bankrupt, its receiver at no time either operated or petitioned for leave to do so, and he did not sell until some six weeks after his appointment. This, we think, was the situation to which the Court was directing its attention when it said that the rights when bought were in a "state of voluntarily suspended animation," and when it stated that the purchaser "cannot say that it takes the rights free of any impairment by the voluntary suspension of operation by the then owner from whom it derives title."

In the case at bar, however, there was no interruption because of bankruptcy. The bankrupt, and its receiver who was duly authorized, operated continuously to the time of the first sale, which was within a week of the receiver's appointment, and when that sale fell through the receiver immediately made a second one. The inter-

---

[6] The receiver testified that after his appointment Topsfield's business shrank almost to the vanishing point, the public having lost confidence in the carrier because it had been adjudicated a bankrupt, and that for this reason and because of his "lack of knowledge about operating an express company and a few other items that came up", he could not continue operations except at heavy loss. This situation we think must be typical of bankruptcy cases and must have been in the mind of Congress when it passed the Motor Carrier Act.

ruption here was because of the sale, a situation to which the Supreme Court in the Gregg case was not directing its attention, as seems to us to be clearly indicated by its statement therein that "the Commission was of opinion that by the time of the sale the cessation of operations was of sufficient duration—at least 69 days—to establish that Gregg had not been 'in * * * operation since' June 1, 1935, within the meaning of § 206(a)"—an opinion which the Court characterized as a "reasonable conclusion".

And we think that the Supreme Court had the facts of the Gregg Cartage case, not any other set of facts, in mind when it used the words upon which the Commission must have relied in reaching its conclusion in the case at bar. These words are:

"Furthermore, the interruption of service was the deliberate act of those who for the time being stood in the position of applicant and owned its rights. During the interval between receivership and sale of these rights to Northeastern, we take it that the beneficial interest therein vested in the creditors and the legal title in the receiver or trustee. The federal receiver or trustee could have been authorized to conduct the business of the bankrupt for a limited period, if in the best interests of the estate."

We think the Commission's reliance upon these words misplaced because authority to operate a business for a limited period, as from the time of appointment to the time of sale, is not at all the same thing as authority to operate for an indefinite period, as from the time of appointment to the time when the Commission may approve a sale. A court of bankruptcy may well feel justified in giving authority to operate at a loss for a limited time which it can define by setting a date for sale, but there must be few instances indeed when such a court would feel justified in authorizing operations at a loss for an indefinite time which it cannot control. But, if the Commission's conclusion is correct, it would have to do either this or else permit the bankrupt's "grandfather" rights to lapse, in either event imposing a loss upon creditors. We are reluctant to believe that either Congress in the Act under consideration or the Supreme Court in construing that Act intended to confront courts of bankruptcy with such a dilemma.

The question remains whether or not Topsfield ever operated beyond its Newark terminal to Philadelphia with such frequency and in such a manner as to give it a right under the "grandfather" clause to a certificate authorizing such operations. The examiner found, as we have pointed out earlier in this opinion, that the evidence was not sufficient to "warrant a grant of authority to serve Philadelphia." But the Commission, in view of its interpretation of the statute, did not make any finding on this question of fact. Since we disagree with the Commission's conclusion of law, this question of fact must now be passed upon.

For the reasons stated, that part of the order appealed from which, as a matter of law, denies the applicant a certificate authorizing it to operate to Philadelphia, and environs, will be set aside and the case remanded to the end that the Commission may decide as a question of fact whether Topsfield's past operations have been of a nature such as to warrant the issuance to Shawmut, as Topsfield's substitute, of a certificate under the "grandfather" clause authorizing operations beyond Newark to Philadelphia.