HERMAN BROS., INC., ET AL., APPELLEES, V.
SPECTOR INDUSTRIES, INC., ET AL., APPELLANTS.

308 N.W.2d 720

Filed July 24, 1981. No. 43392.

Rodney Peake of Peake & Navis, P.A., for appellants.

James E. Ryan of Ryan & Williams, P.C., for appellees.

Heard before BOSLAUGH, McCOWN, CLINTON, and BRODKEY, JJ., and MARTIN, District Judge.

BRODKEY, J.

Peake, Inc. (Peake), a motor carrier incorporated in Nebraska, and Spector Industries, Inc. (Spector), a motor carrier incorporated in Delaware, appellants herein, appeal to this court from an order entered by the Nebraska Public Service Commission denying an application to transfer to Peake the intrastate operating authority issued to Spector. The certificate of authority held by Spector authorized the transportation of bulk cement, limestone, and limestone products between all points in Nebraska over irregular routes. Peake, the wholly owned subsidiary of Ruan Transport Company of Des Moines, Iowa (Ruan), operates under authority to transport petroleum products, molasses, fertilizers, agricultural insecticides, and other chemicals over designated routes in Nebraska. We affirm.

The record in this case indicates that Peake entered into an agreement with Spector whereby Spector would sell its transportation authority to Peake at an agreed price of $20,000, subject to the approval of the Nebraska Public Service Commission. An application requesting authority to transfer Spector's operating rights was filed with the commission in February of 1979. Notice of the application was subsequently published on March 2, 1979, in response to which two formal protests were filed with the commission on March 30, 1979, on behalf

of Herman Bros., Inc., and Dokter Trucking Corporation. On April 24, 1979, the protestants filed a formal complaint alleging that Spector had allowed its certificate of authority to become dormant in that Spector did not perform the services authorized by the certificate. The protestants prayed that the commission revoke the certificate held by Spector. This matter came on for a public hearing before the commission on June 28, 1979, at which time evidence was presented on behalf of the parties herein. On February 12, 1980, the commission entered its order finding that the certificate of authority held by Spector was dormant and that the transfer of the authority to Peake was not supported by a showing of public need. Specifically, the commission found that Spector had entered into lease arrangements with Ruan whereby all shipments made by Spector were transported in equipment owned and operated by Ruan. The commission concluded that these operations were being conducted by Ruan in order to keep the Spector authority active prior to the proposed transfer of the certificate of authority to Peake. The commission held that the lease arrangement resulted in an unlawful use by Ruan of Spector's authority without the requisite approval of the commission as required by statute. In its opinion and findings, the commission stated:

"Mr. Kessler testified that Ruan leased equipment to Spector on a flat-fee basis. The fee was $5.00 per load for the use of the authority. Kessler testified that this was not a normal arrangement in that usually the fee is based on revenue with a split of 60% to 75% depending upon the amount and type of equipment. He characterized that as a 'normal leasing practice['] insofar as the trucking industry is concerned. The flat-fee of $5.00 per load resulted in a payment of less than 1% of the total revenues derived.

. . . .

"Only minimal traffic has been transported under the authority and that transportation was done by Ruan. In 1977, 14 loads of bulk cement were transported under

the authority in Ruan equipment; in 1978, 45 loads; and in 1979, 24 loads. No loads of bulk cement or limestone were trucked prior to 1977. This means that only 73 [sic] loads of bulk cement have been transported under the subject authority.

"There was no evidence of any limestone traffic moving under the subject certificate nor was there any evidence submitted with respect to any traffic, either cement or limestone, originating at Omaha or Superior, Nebraska.

. . . .

"*In short, Mr. Distefano has described a leasing operation that is about as illegal as one could be.* Article 7 of the Motor Carrier Rules of this Commission require that each equipment lease be filed and approved before the lease becomes operative. The evidence shows that rule was violated. The rules [Section (2) (a) (vi)] require that the lessee have complete control of the equipment and that the lessee assume complete responsibility for the control and use of the equipment. The evidence shows that Ruan used its own equipment without any control being exercised by Spector, used it as it pleased, and hauled under its own insurance, all in violation of the rules. These practices completely negate the aims and purposes of the Motor Carrier Act which is to assure the shipping public that the carrier who undertakes common carriage of a commodity has sufficient insurance in force to cover any losses that might occur

will have direct means of holding the carrier responsible. Spector's operations in concert with Ruan constitute an irresponsible, inept attempt to subvert Section 75-318, R.R.S. 1943 which precludes lease of authority without approval of this Commission." (Emphasis supplied.) (Citations to record omitted.)

The commission found that the loads transported by Ruan under the Spector authority consisted of less than 1/10 of 1 percent of the total loads transported in 1977, less than 4/10 of 1 percent of the loads transported in

1978, and less than 8/10 of 1 percent of the loads available for transport through June of 1979. Evidence in the record also reveals that Spector only made minimal efforts to solicit business, principally through social contacts.

In their brief on appeal, appellants make the following assignments of error: (1) The commission erred in finding that appellants willfully failed to comply with the law; (2) The commission erred in finding the certificate dormant; (3) The commission erred in refusing to transfer the certificate to Peake; (4) The commission erred in completely disregarding the prior decisions of this court regarding this certificate; (5) The commission erred in not issuing the requested order; and (6) The commission erred in misconstruing the purposes and intent of the Nebraska Motor Carrier Act.

The general rule which governs our review in this matter has been stated as follows: "'On an appeal to the Supreme Court from an order of the Nebraska State Railway Commission [now Public Service Commission] administrative or legislative in nature, the only questions to be determined are whether the commission acted within the scope of its authority and if the order complained of is reasonable and not arbitrarily made.' . . . 'The determination of what is consistent with the public interest, or public convenience and necessity, is one that is peculiarly for the determination of the Nebraska State Railway Commission. If there is evidence to sustain the finding of the commission, this court cannot intervene.'" *Dahlsten v. Harris*, 191 Neb. 714, 722, 217 N.W.2d 813, 818 (1974). See, also, *Neb. Public Service Commission v. Grand Island Mov. & Stor. Co., Inc.*, 203 Neb. 356, 278 N.W.2d 762 (1979); *Neylon v. Petersen & Petersen, Inc.*, 183 Neb. 813, 164 N.W.2d 452 (1969); *Andrews Van Lines, Inc. v. Nielsen & Petersen, Inc.*, 180 Neb. 764, 145 N.W.2d 584 (1966). It has also been held that where commission approval of a transfer of authority is requested under Neb. Rev. Stat. § 75-318 (Reissue 1976), and an issue of dormancy

is properly raised, the Nebraska Public Service Commission must determine both the fact of dormancy and, on the basis of the evidence, whether the public convenience and necessity require the transfer. *Dahlsten v. Harris, supra.*

Section 75-318 provides that the commission may authorize the transfer of operating rights as follows, in pertinent part: "It shall be lawful, only under the conditions specified in this section, for any motor carrier or nonmotor carrier, or two or more motor carriers to: . . . (2) Purchase, lease, or contract to operate the properties, or any part thereof, certificates, permits or any part thereof, of another motor carrier . . . .

"Whenever a consolidation, merger, purchase, lease, operating contract, or acquisition of control of the properties, certificates, or permits is proposed, the carrier or carriers or person seeking authority therefor shall present an application to the commission, and thereupon the commission shall notify such carriers and other parties known to have an interest of the time and place for a public hearing in accordance with such rules as the commission shall adopt. If, after such hearing, the commission finds that the transaction proposed will be consistent with the public interest and does not unduly restrict competition and that the applicant is fit, willing, and able to properly perform the proposed service, it may enter an order approving and authorizing such consolidation, merger, purchase, lease, operating contract, or acquisition of control of the properties, or any part thereof, certificates or permits or the whole, or any part thereof, upon such terms and conditions as it shall find to be just and reasonable; *Provided,* that if any of the certificates or permits proposed to be merged, consolidated, transferred, or leased are dormant the commission may approve an application for consolidation, merger, transfer, or lease *only upon proof of and a finding that such merger, consolidation, transfer, or lease is or will be required by the present and future public convenience and necessity,* in the same manner as

provided in section 75-311; *and provided further*, that if the proposed merger, consolidation, transfer, or lease of the certificates or permits will permit or result in a new or different service or operation as to territorial scope than that which is or may be rendered or engaged in by the respective parties, or, as to passenger motor carriers, will tend to enlarge competition over that then existing, the commission may approve such an application for merger, consolidation, transfer, or lease only upon the basis of proof of and a finding that the proposed merger, consolidation, transfer or lease is or will be required by the present and future public convenience and necessity, in the same manner as provided in section 75-311. Any restrictions, qualifications, or conditions applicable to and contained in a particular certificate of public convenience and necessity or a permit at the time of the issuance thereof or thereafter made a part of such certificate or permit, excluding hereby any restrictions, qualifications, or conditions of general application, applicable to all motor carriers or a segment thereof as a class, and imposed by regulation of the commission, proposed to be merged, consolidated, transferred, or leased shall not be changed, altered, or removed without the proof required in section 75-311 for certificates and permits." (Emphasis supplied.)

The principal issue raised in this appeal is whether the certificate of authority held by Spector is dormant. The determination of the question of dormancy is a difficult one involving many factors. A persuasive and well-reasoned case discussing the various aspects of the problem is *Wright Trucking, Inc., v. United States*, 403 F. Supp. 119 (D. Mass. 1975), where the court held that the underlying premise of "dormancy" in determining whether a motor carrier should be allowed to purchase operating rights held by another carrier is that if the selling carrier's activity has become minimal or nonexistent, the area's shippers are presumed already to be receiving adequate service from other carriers, who will have adjusted their operations to meet these needs,

and that in determining what factors will promote or retard public interest, the Interstate Commerce Commission has authority to adopt a standard of "dormancy" in determining whether a motor carrier should be allowed to purchase the operating rights of another carrier. In that case, the court stated at 120:

"The ICC denied the Wright-Bonded application because it found that Bonded's operating rights had become 'dormant.' Dormancy is a concept the Commission developed in the course of its statutory oversight of the transfer of operating rights. The underlying premise is that if a selling carrier's activity has become minimal or nonexistent, the area's shippers are presumed already to be receiving adequate service from other carriers, who will have adjusted their own operations to meet these needs. *See Gregg Cartage & Storage Co. v. United States*, 316 U.S. 74, 83, 62 S. Ct. 932, 86 L. Ed. 1283 (1942). A purchaser of dormant rights is seen as aggressively seeking to expand the vendor's relinquished business, *C & H Transportation Co.-Purchase (Portion)-Ferguson Trucking Co.*, 93 M.C.C. 741 (1964), thus inciting a struggle among carriers in the area with damage either to 'the public interest or to intervening or protesting carriers who conducted operations during the interruption of said services,' *Arrow Transp. Co. v. United States*, 300 F. Supp. 813, 818 (D.R.I. 1969).

"While dormancy is not a term found either in the statute or in Commission regulations, it is the sort of standard the Commission is authorized to adopt, having plenary responsibility for administering the national transportation policy, and for determining what factors will promote or retard the public interest. *McLean Trucking Co. v. United States*, 321 U.S. 67, 79-88, 64 S. Ct. 370, 88 L. Ed. 544 (1944)."

The rule is well settled in this state that the Public Service Commission may properly consider rulings made by the Interstate Commerce Commission. *Priesendorf Transp., Inc., v. Herman Bros., Inc.*, 169 Neb. 693, 100 N.W.2d 865 (1960); *Abler v. Herman*

*Bros., Inc.*, 187 Neb. 530, 192 N.W.2d 410 (1971). The Interstate Commerce Commission has recognized that there are no mechanical rules for determining when rights have become dormant, and has applied the "test of substantiality" in resolving issues of dormancy. The test is a flexible one. See *New Dixie Lines, Inc.-Control-Jocie Motor Lines, Inc.*, 75 M.C.C. 659 (1958). Pertinent factors involved include whether the rights involve general or specified commodities, the character of the area served in terms of industry and population, the number of carriers involved in a similar service, whether the rights are radial or nonradial, and whether the financial and material capabilities of the carrier have been utilized as far as practicable. See *Miami Transp. Co., Inc., of Ind.-Pur.-Strothman*, 97 M.C.C. 600, 608 (1964). In *Dahlsten v. Harris*, 191 Neb. 714, 217 N.W.2d 813 (1974), we held that where a carrier, holding a certificate of public convenience and necessity for hauling commodities generally or a generic class of commodities over irregular routes, does not perform a portion of such service through no fault of his own, but is ready, able, and willing to do so, the question of dormancy becomes a question of fact under all the circumstances of the case.

The authority sought to be transferred to Peake authorizes the transportation of bulk cement, limestone, and limestone products over irregular routes in Nebraska. The evidence as presented before the Nebraska Public Service Commission established that since 1977 there has been no traffic in limestone or limestone products. Moreover, the only traffic conducted under the Spector authority has been the transportation of bulk cement originating from Louisville, Nebraska. There has been no traffic in bulk cement from Omaha or Superior, Nebraska, the only other possible points of origin for such traffic. As the traffic conducted from Louisville was conducted under a lease agreement entered into between Ruan and Spector, we must focus on the nature of said lease in order to determine

whether it complied with the requirements for a lease as established by the commission.

In this regard, the rules and regulations of the Nebraska Public Service Commission, Ch. III, art. 7, § (2), provide for the procedure to be followed when motor carriers lease equipment. Those rules provide that a written lease agreement is to be signed between the transferor and the transferee, specifying the period for which the written agreement applies and also specifying the compensation to be paid by the transferee for the rental period. Section (2)(a)(vi) further requires that the lease "[p]rovide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the transferee for the duration of the written agreement." Lastly, the rules provide that the lease must be approved by the Nebraska Public Service Commission.

At the hearing it was established that the transportation of bulk cement requires the use of special equipment and that Spector did not own such equipment in Nebraska. Sam Distefano, the terminal manager for Spector, testified that since 1977 the service performed by Spector was made using leased equipment from Ruan. On cross-examination, Distefano testified that Ruan Transport maintained complete control of the trucks being leased to Spector by controlling the drivers of the vehicles, maintaining insurance on the vehicles, and bearing all expenses incurred in the operation of the vehicles. Distefano stated that he, as the transferee, had no control over the drivers or the equipment leased by Spector, and was unable to testify as to whether Ruan had filed the necessary papers in order to operate under the Spector authority. Finally, Distefano conceded that it was possible that Ruan was developing traffic under the Spector authority.

As demonstrated above, the leases entered into between Ruan and Spector clearly violated § (2)(a)(vi) of the commission's rules. Ralph Saathoff, the director of motor transportation for the commission, testified that

the necessary filings that need to be made in order to lease equipment had not been registered with the Public Service Commission. As to the lease arrangement's compensation, the testimony reveals that Spector was paid only $5 per load rather than the 65-35 percent split which was testified to be the normal lease arrangement between leased operators.

Based upon the testimony presented at the hearing, the Public Service Commission found that the only traffic conducted under the Spector authority had been made pursuant to a lease arrangement which violated the commission's rules and regulations. We conclude that the evidence clearly supports the finding by the commission that the lease was unlawful and was entered into as a sham in order to keep the Spector authority active prior to the application of Peake. This being so, we determine that there was an adequate factual basis on which the commission could determine that the authority held by Spector was dormant, and also that the findings of the commission are supported by evidence in the record.

We therefore determine that the order of the Nebraska Public Service Commission should be, and hereby is, affirmed.

AFFIRMED.

BOSLAUGH, J., concurring.

I concur in the judgment upon the ground that the operations under the certificate issued to Spector Industries, Inc., were in violation of the regulations of the commission. See *Ace Gas, Inc., v. Peake, Inc.,* 184 Neb. 448, 168 N.W.2d 373 (1969).