UNITED STATES of America,

v.

Donald Kenneth CURRENS, Appellant.

No. 13152.

United States Court of Appeals
Third Circuit.

Argued Oct. 7, 1960.

Decided May 1, 1961.

Hastie, Circuit Judge, dissented in part.

752

H. David Rothman, Pittsburgh, Pa., for appellant.

Hubert I. Teitelbaum, U. S. Atty., Daniel J. Snyder, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Before BIGGS, Chief Judge, and HASTIE and FORMAN, Circuit Judges.

BIGGS, Chief Judge.

Currens, the appellant, was convicted by a jury of a violation of Section 2312, Title 18 U.S.C., the National Motor Vehicle Theft Act, the so-called "Dyer" Act, and was committed as a young adult offender to the custody of the Attorney General for treatment and supervision pursuant to Section 5010(b) of the Youth Corrections Act, 18 U.S.C. § 5010(b), until discharged by the Federal Youth Correction Division pursuant to law. The facts relating to his crime briefly stated, are as follows:

On September 16, 1958, Currens, then approximately 22 years of age and living with his grandparents in Mansfield, Ohio, went to an automobile salesman in that city. He told the salesman that he desired to buy a designated automobile and a price of $3,800 was tentatively agreed upon. Currens then requested permission to drive the car for a brief period, saying that he desired to show it to his wife. The salesman agreed to let him have the use of the car for several hours but Currens drove the car to Waterford, West Virginia, taking with him a young woman who was not his wife. Accompanied by his female companion he later drove the car to the Pittsburgh airport where he abandoned it. Currens was arrested in Las Vegas, Nevada, and was interviewed there by Agent Parker of the Federal Bureau of Investigation on November 1, 1958. He wrote out and signed a statement, really a confession,

which was introduced in evidence at his trial as Government's Exhibit No. 2. In this statement he admitted that he had obtained the car by "pretense" and stated that he was not sure where he had left it, suggesting that perhaps he had driven it to New York City. He stated that he recalled driving the car to Wheeling, West Virginia, but that he could not remember clearly what had transpired after that. When interviewed by Agent Parker for the second time on November 14, Currens stated that he did not recall "too clearly" talking with the F.B.I. agent only two weeks before. He asserted also that he had consumed large quantities of liquor prior to his leaving Mansfield.

Currens was returned to Pittsburgh and was confined in the Allegheny County Jail for want of bail. On February 19, 1959, he was examined by Dr. Maurice H. Bowers, a qualified neuropsychiatrist of Pittsburgh. Dr. Bowers prepared a report, dated February 19, 1959, addressed to the Department of Justice and the United States Attorney, introduced at the trial as Defendant's Exhibit C, in which he stated that he found that Currens was "able to understand the proceedings against him so as to assist in his own defense.", that he believed Currens to be "competent mentally * * * and that he knows right from wrong but has not adhered to the right." The indictment against Currens was handed down on March 20, 1959. On June 1, 1959, however, the United States Attorney filed a petition in which he referred to Dr. Bowers' findings quoted above in part, but went on to say: "However, the conduct of * * * [Currens] while confined in the Allegheny County Jail was such that he was transferred to the United States Penitentiary at Lewisburg, Pennsylvania, for emergency hospitalization", that a report of May 25, 1959, by Dr. Manly B. Root, Chief of the Psychiatric Service of the Lewisburg Penitentiary, stated that Currens had a "mental disease, namely hysteria" and

that a further psychiatric examination would be necessary to determine whether he was able to understand the proceedings against him and properly to assist in his own defense.[1] The United States Attorney prayed that Currens be examined again by Dr. Bowers pursuant to Sections 4244–4247, Title 18 U.S.C. The court below entered the order requested.

On June 4, 1959, Dr. Bowers again examined Currens and on June 8 again rendered a report, introduced at the trial as Defendant's Exhibit B [sic] to the Department of Justice and to the United States Attorney. He concluded, among other things, that as of that time Currens was not "able to understand the proceedings against him so as to assist in his own defense", and that "The Instability of Emotions is believed to cause his Anxiety to reach such proportions that his judgment is impaired as well as his ability to concentrate; [and] at such times he would therefore be unable to understand proceedings." On June 11, 1959, a hearing was held to determine the mental competency of Currens. The court found him mentally incompetent and pursuant to Section 4246, Title 18 U.S.C., ordered him committed to the custody of the Attorney General until he was "restored to mental competency sufficiently to stand trial. * * * "

Currens was then sent to the Medical Center for Federal Prisoners at Springfield, Missouri for examination and treatment. The reports of the Medical Center were admitted in evidence at Currens' trial as part of Defendant's Exhibit D. The earliest date with which they are concerned is June 16, 1959; the latest, September 22, 1959. The second sheet of the reports gives Currens' "Previous Criminal History". It lists eight criminal offenses or charges, most of them of a petty nature. The most serious of these was the passing of worthless or forged checks. The offenses, while small, cover a wide range both geographically and by categories. As examples we point out that Currens served two years in the

---

1. Dr. Root's report is not in evidence. We know of its contents only from the petition of the United States Attorney.

Federal Reformatory at El Reno for impersonating an Air Force officer in New Orleans and later received a comparatively light sentence at Tempe, Arizona for petty thievery. The doctors at the Springfield Medical Center observed that some paralysis, unparticularized as to location in the report, was observable on his arrival at the hospital at the Lewisburg prison in March 1959 and that he claimed he had suffered injuries several years before when thrown by a horse and that his back had been reinjured in a jump from an upper bunk while in jail. At the Medical Center Currens was thought to be hysterical in asserting that he was suffering from these back injuries but an actual test showed that the protein in his spinal fluid was abnormally elevated. The Medical Center report also asserts that Currens resented his commitment for examination under Section 4246, Title 18 U.S.C. and complained because he was not allowed to plead guilty and receive sentence, apparently fearing that he might be held in custody indefinitely. His record, at least as disclosed by the Medical Center authorities, indicates that he is a person of somewhat better than average intelligence, ordinarily somewhat affable, but subject to occasional explosive and irrational courses of conduct. He is shown as a consistent minor violator of institutional regulations, with "borderline" behavior. The following sentence from one of the Medical Center reports, Exhibit D, is suggestive: "He [Currens] has appeared to be a somewhat disturbed person with hypochondriacal and hysterical tendencies, yet he has not been sufficiently disturbed to warrant a psychotic diagnosis." Currens asserted that he could not remember the offense with which he was charged. The examining psychiatrists expressed doubts as to whether Currens was a pathological liar or was actually subject to amnesiac periods which caused memory blanks which he attempts to fill with confabulation.[2]

That portion of the Medical Center reports, also part of Exhibit D, indicated as dictated by "EHM, 9–11–59", headed "Present Situation" is, we think, illuminating. It is as follows: "Currens was assigned to an open ward for older patients on arrival * * *. He also had approximately two weeks on an acute treatment ward when he, in anger, made statements which sounded as though he might take his own life. He has not received any formal behavior reports but neither has his adjustment been particularly commendable. He had no work assignment for the first two months but has recently been placed in the Food Service. He has asked to be assigned to Industries so that he might earn some money. He appears to have sufficient judgment not to get into outright difficulties, but the problem of being unable to recall his offense remains with him. He is essentially unperturbed with his mode of adjustment to living and it would appear that he finds an institutional atmosphere a fairly compatible one, including its value as a focus of hostility. It would appear also that whatever physical difficulties he has also serve the pur-

---

2. Confabulation is defined as: "In psychiatry, [as] the act of replacing memory loss by phantasy or by reality that is not true for the occasion. The term implies also lack of insight, in the sense that the subject fully believes his answers to be correct. Confabulation is not uncommon in organic brain diseases in which intellectual impairment is a prominent feature. For example, the patient with a Korsakoff syndrome often fills in the memory gaps with incorrect details. A patient, bedridden in the hospital for months, said that he had just returned from a European journey and gave many details of the trip, believing thoroughly in his account.

"Confabulation is to be differentiated from *pseudologia fantastica* (q.v.), which occurs mainly in the 'psychopathic' group and in other conditions in which acting-out is prominent. In pseudologia fantastica, the phantasy is believed only momentarily and will quickly be dropped if the patient is confronted with contradictory evidence. The confabulator, in contrast, will stick steadfastly to his story." Hinsie and Campbell, Psychiatric Dictionary (3d ed. 1960), Oxford University Press, p. 147.

pose of removing him one step further from an active and responsible life."

The Psychological Examination of Currens at the Medical Center was quite complete. A battery of tests was employed on June 18 and July 9, 1959, and the results are set out in detail in the report of August 3, 1959 of Dr. George A. Geil, a Clinical Psychologist of the United States Public Health Service which also is included in Exhibit D. These tests included the Color Sensitivity Personality Test, the Rorschach Test and the Multiple Approach Personality Inventory. All of these tests tend to show that Currens possessed and possesses an extremely disturbed and possibly disintegrating personality and that his contacts with reality have been "seriously weakened". Phrases like "Weak reality contact, withdrawn emotions," are not infrequent in Dr. Geil's report. Currens is said to be "Depressed or excited in a way not understood * * * Frightened by the hearing of strange or frightening voices". Dr. Geil gives his "Psycho-diagnostic Impression as follows: "(1) Basic sociopathic personality disturbance and (2) major emotional disturbance (schizophrenic reaction, undifferentiated type). In view of patent's claimed head injury in 1958 and subsequent symptomatic complaints, an EEG [electroencephalogram] study is recommended to help clarify the likely presence or absence of a chronic brain syndrome associated with brain trauma."

A Report of a Neuropsychiatric Examination follows as a portion of Exhibit D. This states in part: "He [Currens] is oriented as to time, place and person; emotionally, judgment and insight are superficial. He showed a degree of concretism [3] in his responses to the abstrac-

tions test. Psychological test findings indicate intellectual functioning within average range. The psycho-diagnostic impression was of a major emotional disturbance, schizophrenic reaction, undifferentiated type in an individual with a basic sociopathic personality disturbance."

The diagnosis of the Classification Study of the Medical Center, part of Exhibit D, was that Currens was subject "to a sociopathic personality disturbance, [an] antisocial reaction in an individual who tends to become schizophrenic under stressful circumstances, as manifested by a history of antisocial behavior, superficiality of affect and judgment, affability and psychological test evidence suggestive of schizophrenia."

Last among the Reports of the Medical Center, included in Exhibit D, is a report of a Neuropsychiatric Staff Examination, dated September 17, 1959. This states that "Medical evaluation led to the conclusion that his [Currens'] symptoms arose from a psychoneurotic hysterical state." This report goes on to say that, "Following his [Currens'] admission to the Medical Center he experienced severe entractable headaches and after becoming agitated threatened to commit suicide. Under tranquilizing medications he underwent a remission from his symptoms and since then has made a very good ward adjustment and an excellent adjustment at his job assignment as a clerk in the culinary service. After initial psychiatric evaluation at the Medical Center he was given the diagnosis of sociopathic personality disturbance, antisocial reaction in an individual who tends to become schizophrenic under stressful circumstances as manifested by a history of antisocial behaviors, superficiality of

3. "In analytical psychology concretism is defined as 'a definite pecularity of *thought* and *feeling* which represents the antithesis of abstraction. The actual meaning of concrete is "grown together." A concretely-thought concept is one that has grown together or coalesced with other concepts. Such a concept is not abstract, not isolated, and independently thought, but always im-

pure and related. It is not a differentiated concept, but is still embedded in the sense-conveyed material of perception. Concretistic thinking moves among exclusively concrete concepts and views; it is constantly related to sensation.' (Jung, C. G. Psychological Types, tr. by Baynes, H. G., Harcourt, Brace, New York and London, 1923)". Hinsie and Campbell, op. cit. supra note 2 at p. 146.

affect and judgment, affability and psychological test evidence suggestive of schizophrenia." There follows the statement that as of the day of the staff meeting, September 17, 1959, Currens was rational and coherent, and that in answers to questions concerning his prospective role in his forthcoming trial, he manifested "a realistic attitude and an adequate degree of understanding of his situation." The report concludes with the Staff's Recommendation that he was in remission from his previous episode of severe emotional disturbance and that he was able to understand the proceedings against him and to assist in his own defense.

On October 19, 1959, the court below, having before it the Report of the Medical Center last referred to, ordered the United States Marshal to take Currens back into custody, and on December 1, 1959, ordered him to stand trial. He pleaded not guilty and was tried by a jury. The trial commenced on December 2 and was concluded on December 4, 1959. All of the medical reports which we have referred to were introduced in evidence save that of Dr. Root which apparently was not available. See note 1, supra. Immediately after the noon recess on the first day of the trial Currens through his counsel[4] stated that he, as then advised, pleaded "'not guilty' because of insanity"[5]. This plea was accepted by the court without objection by the United States.

Dr. Bowers testified for the appellant at the trial. He reiterated his diagnoses of Currens' illness in substance as set out in his two reports which we have referred to previously. He described Currens again as a sociopathic personality possessing an emotional instability reaction but that he knew the difference between right and wrong but would not adhere to the right. Dr. Bowers would not say that Currens was subject to irresistible impulses which caused his criminal behavior but rather that he reacted without due regard for consequences and that his illegal and antisocial conduct was repetitive and an outgrowth of his type of personality. Dr. Bowers testified that it was his opinion that Currens' theft of the car, as charged in the indictment and as proved by the evidence, was the result of Currens' sociopathic personality and that a person with such a personality cannot be considered to be "a mentally healthy person". Asked if the "sociopathic condition" was itself a mental disease, Dr. Bowers replied, "[W]e consider it under the classification of mental illness, but we do not consider them [persons possessing sociopathic personalities] in the legal sense to be 'insane'." The Doctor also said that Currens was not "insane" in the sense that that legal, non-medical, term is employed, that the term "sociopathic personality" is not a term precisely indicating a mental illness but that it does have "mental implications". He stated also that: "It is a very fine line, as I pointed out before, between the psychopathic type of personality and a true mental psychotic personality.", and that "We do not use the word 'sane' or 'insane' in medicine." Dr. Bowers would not say that Currens was schizophrenic but indicated that he might be schizoid[6] and that he had symptoms, as shown by the Medical Center tests, that would fit "the schizophrenia tendency". He stated, nonetheless, that the schizoid personality and the sociopathic personality are closely related.

4. The court below appointed H. David Rothman, Esquire, of the Allegheny County Bar, as attorney for Currens. Mr. Rothman has served his client ably and without compensation both in this court and in the court below.

5. See transcript of testimony, p. 52.
   The court also states in its charge, transcript of testimony p. 135, that Currens interposed "a plea of intoxication" but we cannot find where this plea was brought upon the record. We accept the trial judge's statement that it was made.

6. Schizoid: "Resembling the division, separation or split of the personality that is characteristic of schizophrenia." Hinsie & Campbell, op. cit. supra note 2 at p. 658.

There is evidence to support a finding that there has been no substantial fundamental change in Currens' mental illness or disorder between September 16, 1958 when Currens committed the Dyer Act violation and the occasions referred to in this opinion when he was examined by the doctors, whom we have named, and his condition on the day of his trial.[7]

Currens took the witness stand but his testimony need not be referred to in detail here. He stated in substance that the charge laid against him in the indictment was true. Some of his evidence was bizarre in the extreme. For example, he testified that he "just jumped in [the stolen automobile] to get out of the rain."[8] He seemed to be lacking in insight as to the nature of his difficulties and those he had brought on others.

■ At the close of the testimony offered by Currens, his counsel moved for a "directed verdict of acquittal" on the ground that Currens was not guilty by reason of his insanity or unsound mind or, apparently alternatively, that because his crime was a product of a mental disease, defect or illness" he was not responsible criminally for his conduct. The proper motion would have been one for a judgment of acquittal under Rule 29(a), Fed.R.Crim.Proc., 18 U.S.C., motions for directed verdicts having been abolished by the Federal Rules of Criminal Procedure. But in any event, treating the motion for a directed verdict as the equivalent of a motion for a judgment of acquittal, as the court below treated it, no error was committed by the court below because Currens' mental condition at the time of the commission of the offense clearly was a question for the jury.

Currens' counsel then submitted two "Points for Charge". The first was based on the M'Naghten Rules, X Clark & Finnelly, at 208 et seq. 8 English Reports, Reprint, at 722, et seq., as follows: "If, at the time of the commission of the offense for which the defendant stands accused, the defendant was not able to distinguish right from wrong, and if you, members of the jury, find such to be the case in the cause which you are now trying, you must find the defendant not guilty by reason of insanity or unsound mind." The second request for charge was as follows: "If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition or mental illness at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition or mental illness when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition or mental illness, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity or unsound mind. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect or mental illness. He would still be responsible for his unlawful act if there was no causal connection or relation between such mental abnormality and the act or crime for which the defendant stands accused. These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case." This requested charge is in substance that approved by the Court of Appeals for the District of Columbia Circuit in Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.

7. In so stating we are not unaware of the fact that Currens' ability to understand the nature of the proceedings against him and his capacity to stand trial was brought about by his treatments at the Springfield Medical Center. The treatments tranquilized Currens and permitted him to exercise insight as to the nature of his crime but the evidence will support the inference that no substantial fundamental change has been effected in respect to his mental illness or disorder.

8. See transcript of testimony, p. 95.

2d 862, 875, 45 A.L.R.2d 1430.[9] The Court stated that it would affirm the first request for instructions, based on the M'Naghten Rules, but would deny the second, based on Durham. The court then proceeded to so charge the jury but added, as an additional test of Currens' criminal responsibility, the so-called irresistible impulse rule. The court also charged as to the applicability of the conception of "temporary insanity".

After the completion of the charge, Currens' counsel objected to it pursuant to Rule 30, Fed.R.Crim.Proc. 18 U.S.C., stating, " * * * I would take exception to that portion of the charge which indicates that if the defendant was suffering from a mental disease at the time he committed the offense, that would be no excuse for committing crime." The court replied: "Very well. Is there anything else?" Currens' counsel then said, "I do not believe there is anything else * * *". After delivering a supplemental charge the court again asked, "Anything else, gentlemen?" Currens' counsel then said: "No, your Honor". The jury then retired and returned with a verdict of guilty. A motion for a judgment of acquittal or in the alternative for a new trial was then made by Currens' counsel under Rule 29, Fed.R.Civ. Proc., 18 U.S.C. The substantial point raised by this motion was the failure of the court below to charge that Currens' offense was the product of mental illness or of unsound mind as required if the Durham formula was applicable. The motion was denied without opinion. The appeal followed.

Rule 30 of the Federal Rules of Criminal Procedure, Title 18 U.S.C., provides in part that, "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The alleged error assigned by Currens on this appeal is that the court below instructed the jury in accordance with the knowledge of right-and-wrong standard of the M'Naghten Rules when the proper course would have been to charge in accordance with the Durham formula. As is evident from the summary of the proceedings set out above there is some question whether Currens' counsel complied with Rule 30, thus preserving his objection on this appeal. First, in his points for charge he requested both the Durham formula and the right-and-wrong test of the M'Naghten Rules. Second, after the court denied his point for charge on the Durham formula, Currens' counsel ob-

9. The charge approved by the Court of Appeals for the District of Columbia Circuit, 214 F.2d at page 875 was as follows: "If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act * * * These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case."

Currens' counsel took few liberties with the language of the Court of Appeals of the District of Columbia Circuit. First, he added the phrase "or mental illness" to the first sentence of the suggested charge immediately after the phrase "defective mental condition". Next he added the phrase "or unsound mind" at the end of the third sentence. Last, he added the phrase "or mental illness" at the end of the fourth sentence. But these small changes do not affect the substance of the request. It was in fact based on Durham.

jected in a somewhat vague manner. If we were to find that Currens' objection to the court's charge was insufficient for the purposes of Rule 30 we would need to go no further in this case.

■ Rule 30 embodies a well recognized principle of sound judicial administration, viz., that no party ought to be allowed to assign as error on appeal a ruling by a trial judge that might have been corrected in the first instance had a timely objection been made. The rule encourages counsel to call the possibility of prejudicial error to a trial court's attention before the error irreparably taints the litigation. United States v. Lang, 3 Cir., 1956, 239 F.2d 676. It must be recognized that this rule although sound and fundamental is grounded solely on pragmatic considerations of juridical economy and convenience. It is designed to serve a well defined procedural purpose. Such a rule should not be employed woodenly, but should be applied where its application will serve the ends for which it was designed. If it be applied blindly and without the benefit of analysis of particular fact situations before individual courts in specific cases it will be transformed from a sound principle of judicial administration into a trap for the unwary, a trap reminiscent of the senseless technicalities that characterized common law procedural systems and which made them a source of scorn and anger to many lawyers and to most laymen.

■ There are several reasons why we conclude that Rule 30 was, in sub-stance, complied with in the instant case. First, Currens made his objections to the application of the M'Naghten Rules standard in three express ways at times when the court could have modified its charge if it had considered itself bound to do so. Immediately before the charge, he asked for a "directed verdict" on the basis of the Durham formula. One of his points for charge was based on the Durham formula and although he coupled this request with a request for the M'Naghten Rules standard it would appear that the request put the trial court on notice of what he was attempting to have the court do. After the court delivered its charge in accordance with the M'Naghten Rules, while omitting a charge based on the requested Durham formula, Currens' counsel raised an objection which can be most reasonably interpreted as an objection to the omission of the Durham formula test from the charge.

Second, our examination of the record convinces us that throughout the trial it was understood by the court, and the Assistant United States Attorney that Currens' defense was based primarily on the Durham formula. The transcript of the proceedings at trial demonstrates beyond any serious doubt that the trial judge and the parties understood that the present case was being prepared and presented with one purpose in mind, and that was to have this court decide on appeal whether the M'Naghten Rules, the Durham formula, or perhaps some other test of criminal responsibility should be in effect in this Circuit.[10] Moreover, the

---

10. The following excerpts from the record indicate the awareness of the court and the parties of the issue raised on this appeal.

"Mr. Rothman: Now, your Honor, as far as my understanding of the test which is used in the Federal courts, I am aware of the tests so far as being used in the circuit, and I am also aware of the test being used in the District of Columbia Circuit. There might be some question here about which test I will request the Court to use, but that is a matter for the Court's discretion.

"The Court: Mr. Rothman, are you going to undertake to have the Court of Appeals for the Third Circuit decide whether the Durham rule exists in this circuit or not? It is a very interesting question.

"Mr. Rothman: Your Honor, I cannot make any money on this case, I might as well try to make some history.

"The Court: All right." [Transcript of Testimony, pp. 51–52]

\* \* \* \* \*

"The Court: Now, do you want the psychiatrist from Springfield?

record indicates that the court below felt that establishing a standard other than the M'Naghten Rules as the law of this case was not consistent with its function as a district court, but was a decision that should be left to this court. Under such circumstances, we can understand, even if we cannot completely condone, the rather casual and inartistic attempts by Currens' counsel to comply with Rule 30. Nonetheless, in our opinion, the purpose of the rule was sufficiently satisfied. The trial court was on notice throughout the trial that it would ultimately have to choose between competing rules when framing the charge the jury was to use in assessing Currens' defense of insanity. The objections raised by counsel at the time the court was considering its charge were, in the light of the general atmosphere pervading the trial, sufficient to call to the court's attention the fundamental decision that it was required to make. Furthermore, there can be no doubt that the very capable trial judge was fully aware of the grounds of Currens' objection to the application of the M'Naghten Rules in the present case for the merits and demerits of that rule have been widely debated by members of the legal profession and in contemporary literature. Rule 30 should not be construed to require that a court be made more aware of the nature of a party's objections than was the court in the present case.

Third, the United States has not suggested or even hinted that Currens is

"Mr. Rothman: Yes, the psychiatrist at Springfield will testify that this defendant knew right from wrong, based on his report. I have no evidence in these reports that he did not know right from wrong, so my plea will have to be here that he was suffering from mental illness and therefore the crime was the product of that mental illness. I feel that would be my only purpose in requesting that psychiatrist or any psychiatrist, to establish that his crime was the product of mental illness.

"I have no indication from any record that he could not distinguish right from wrong, though he testified he did not know when he did any of this." [Transcript of Testimony, p. 96]

* * * * *

"Q. Now, Doctor [Bowers], let me ask you this: You are familiar—Strike that, please. Would you consider a person classified as a sociopathic individual, a person suffering from a mental disease defect or mental illness, and feel free to describe those terms, if you need to. A. Well, you can have combinations, yes. You can have a sociopathic personality and you can also have someone who develops a definite mental illness and that can again be in mild or severe proportions. We see that. Because a borderline between a personality disturbance and a psychosis is very easily stepped over." [Transcript of Testimony, pp. 106–107]

* * * * *

"Q. I am not sure that the answer is responsive, Doctor [Bowers].

"The problem is this, Doctor: If a person suffers from a mental disease or mental defect or mental illness and can still distinguish right from wrong, that does not exclude the possibility, does it, Doctor, that his conduct might still be the product of that mental disease, mental illness or mental defect? A. No, because they can vary from time to time." [Transcript of Testimony p. 109]

* * * *

"Q. All right, Doctor [Bowers].

"Now, Doctor, are you able to express an opinion as to whether Donald Currens' conduct in September of 1958 relating to the transportation of this motor vehicle and his past conduct, wherein he has been in some difficulty with the law, have been the product of his sociopathic disturbance? A. Well, that is very likely; probably it was a ramification or outgrowth of his type of personality." [Transcript of Testimony p. 110]

* * * * *

"Q. Doctor [Bowers], could you conclude with the test, the right and wrong test,—that it is an adequate test for the determination of mental competency?

"Mr. Snyder: I believe that is objected to. I believe he has already said he described a person's personality and their behavior patterns and so on, and then the Court applies the legal law to the facts presented by the witness. I don't believe that is a fair question to be asked of this witness and I therefore object.

"The Court: That question has been debated by lawyers and doctors for a long time. I don't think it is proper in this case. It might lead to a symposium, that would extend over weeks."

not entitled to raise on this appeal the issue as to the nature of the rule of criminal responsibility to be applied.

In view of all of the foregoing we are of the opinion that on this appeal we have the duty to determine the correctness of the trial court's charge on the issue of Currens' criminal responsibility.

Before we come to the merits of the appeal a preliminary point must be disposed of, however. Was the evidence presented at the trial sufficient to dissipate the presumption of Currens' sanity or sound mental health and raise the issue of his insanity or mental illness? In Davis v. United States, 1895, 160 U.S. 469, 486–488, 16 S.Ct. 353, 40 L. Ed. 499, it was settled that when lack ·of mental capacity was raised as a defense to a criminal charge the law presumes that all persons are "sane" or in sound mental health but when some evidence of mental disorder is introduced, the prevailing rule in most jurisdictions is that sanity, like any other fact, must be proved as part of the prosecution's case beyond a reasonable doubt. Leland v. Oregon, 1952, 343 U.S. 790, 797, 72 S. ·Ct. 1002, 96 L.Ed. 1302. See also Tatum v. United States, 1951, 88 U.S.App.D.C. 386, 190 F.2d 612. Fitts v. United States, 10 Cir., 1960, 284 F.2d 108. In the Tatum case the court said, supra, 190 F. 2d at page 615, "We are aware, of course, that any attempt to formulate a quantitative measure of evidence necessary to raise an issue can produce no more than an illusory definiteness". The court went on to indicate that "some evidence" was sufficient to raise the issue of mental illness or insanity, probably something less than that required to create a reasonable doubt, but in the Fitts decision, supra, the Court of Appeals for the Tenth Circuit, by Chief Judge Murrah, ruled that no one could doubt that confinement in a mental institution upon an adjudication of mental illness was sufficient to generate a doubt sufficient to provoke in·quiry as to the mental capacity of the accused to commit the crime for which he was charged. Fitts was adjudicated and institutionalized for treatment because

of chronic alcoholism. The circumstances relating to Currens' pretrial examinations and the orders confining him to Lewisburg and the Springfield Medical Center are enough to provoke inquiry as to Currens' capacity to commit the offense charged in the indictment. It is clear therefore that Currens has met the initial burden imposed on him by the Davis, Tatum and Fitts decisions and that the burden was shifted to the United States to prove beyond a reasonable doubt that Currens possessed the necessary mental capacity, the guilty mind or *mens rea*, to be guilty of the crime with which he was charged.

We come now to another question which must be decided before we can reach the issue of what rule of criminal responsibility should be imposed in respect to Currens: whether that of M'Naghten or Durham or some other. We are aware that some jurists and legal scholars are of the view that, as a matter of law, a psychopath is not "insane". This view seems to be based on a fear that a rule recognizing that a psychopath may not be capable of possessing a "guilty mind" would open the door to the acquittal of persons accused of crime solely on the basis of a history of recurrent antisocial conduct. It is readily apparent that this objection to the inclusion of psychopaths among those entitled to raise the defense of insanity assumes a particular definition of psychopathy; viz., that the term psychopathy comprehends a person who is a habitual criminal but whose mind is functioning normally. Perhaps some laymen and, indeed some psychiatrists, do define the term that broadly; and insofar as the term psychopathy does merely indicate a pattern of recurrent criminal behavior we would certainly agree that it does not describe a disorder which can be considered insanity for purposes of a defense to a criminal action. But, we are aware of the fact that psychopathy, or sociopathy, is a term which means different things to experts in the fields of psychiatry and psychology. Indeed, a confusing welter of literature has grown up about the term

causing some authorities to give up its use in dismay, labelling it a "waste basket category." See, e. g., Partridge, C. E., Current Conceptions of Psychopathic Personality, 10 American Journal of Psychiatry, pp. 53–59 (1930).

We have examined much of this literature and have certainly found it no less dismaying than those authorities to which we have just referred. Our study has, however, revealed two very persuasive reasons why this court should not hold that evidence of psychopathy is insufficient, as a matter of law, to put sanity or mental illness in issue. First, it is clear that as the majority of experts use the term, a psychopath is very distinguishable from one who merely demonstrates recurrent criminal behavior. For example, Dr. Winfred Overholser, Superintendent of Saint Elizabeths Hospital in the District of Columbia, has stated that the Hospital takes the unequivocal position that sociopathy is a mental disease. Dr. Overholser in stating that this is the position of the Hospital uses the words "the Hospital" in the same sense that a judge uses the term "the court" in expressing the judgment of his tribunal. Moreover, the American Psychiatric Association in 1952 when it published its Diagnostic and Statistical Manual, Mental Disorders (Mental Hospital Service), altered its nomenclature, p. 38, removing sociopathic personality disturbance and psychopathic personality disturbance from a non-disease category and placing them in the category of "Mental Disorders". See also note 11, cited to the text, p. 16, in the concurring opinion of Judge Burger in Blocker v. United States, D.C.Cir.1961, 288 F.2d 853.

One of the most respected, perhaps the leading, modern works on psychopathy is The Mask of Sanity by Hervey Cleckley, M.D. (Mosby 1941). Dr. Cleckley's findings are best summarized in Professor Robert W. White's, The Abnormal Personality (Ronald Press 1948) at p. 401 as follows: "He [Cleckley] rules out those cases in which social standards are rejected only in respect to some one particular kind of behavior: for example, alcoholism or deviant sexual behavior in a person otherwise adapted to social demands. He also rules out those cases in which delinquency and crime have been adopted as a positive way of life—in which the person is an enemy of society but is capable of being a loyal and stable member of a delinquent gang. There remains a group characterized by a diffuse and chronic incapacity for persistent, ordered living of any kind. These are, in Cleckley's view, the true psychopathic personalities. They need not be diagnosed negatively, by exclusion of other possibilities. They constitute a true clinical entity with a characteristic pattern of symptoms." After some discussion, Professor White concludes at p. 404: "It is clear that we are dealing with a fairly serious disorder. There are grave disturbances in the patient's affective life as well as in foresight and the control and organization of behavior. Cleckley considers the condition serious enough to be classed as a psychosis. Although the patient outwardly presents a 'convincing mask of sanity' and a 'mimicry of human life,' he has lost contact with the deeper emotional accompaniments of experience and with its purposiveness. To this extent he may be said to have an incomplete contact with reality, and it is certainly very hard to approach him and influence him therapeutically."

Thus, it can be seen that in many cases the adjective "psychopathic" will be applied by experts to persons who are very ill indeed. It would not be proper for this court in this case to deprive a large heterogeneous group of offenders of the defense of insanity by holding blindly and indiscriminately that a person described as psychopathic is always criminally responsible.

▮ Our second reason for not holding that psychopaths are "sane" as a matter of law is based on the vagaries of the term itself. In each individual case all the pertinent symptoms of the accused should be put before the court and jury and the accused's criminal responsibility should be developed from the

totality of his symptoms. A court of law is not an appropriate forum for a debate as to the meaning of abstract psychiatric classifications. The criminal law is not concerned with such classifications but with the fundamental issue of criminal responsibility. Testimony and argument should relate primarily to the subject of the criminal responsibility of the accused and specialized terminology should be used only where it is helpful in determining whether a particular defendant should be held to the standards of the criminal law.

■ It is for such reasons that we feel sure that the Court of Appeals for the District of Columbia Circuit has applied the Durham formula to all types of mental illness including psychopathy or sociopathy. Whether a psychopath or a psychotic suffers from illness of such a nature that he should not be held to criminal responsibility is a jury question in the District of Columbia. Taylor v. United States, 1955, 95 U.S.App.D.C. 373, 222 F.2d 398, 404; Stewart v. United States, 1954, 94 U.S.App.D.C. 293, 214 F.2d 879, 881. Indeed in the case last cited a charge to the jury that a psychopath "is not insane within the meaning of the law" has been held by the Court of Appeals for the District of Columbia Circuit to be reversible error. We think that that Court in permitting an insanity defense to be employed in the case of the sociopath is pursuing the correct course for the mental condition of the accused is one of ultimate fact to be found by the jury which must always determine the defendant's *mens rea* or lack of it.

■ For purposes of the present case it is sufficient to point out that the evidence introduced on the issue of Currens' criminal responsibility consists of substantially more than his history of recurrent criminal behavior. A reasonable jury could infer that Currens is mentally incapable of ordered social living; that he is subject to hysterical episodes; that under stress he has many symptoms of the incapacitating disease of schizo-phrenia; and that he is generally subject to depression, fright, and losses of contact with reality. On the basis of such evidence we believe that a jury reasonably could find that he did not possess the necessary guilty mind when he committed the crime of which he is accused.

The court below, relying on the decision of the Supreme Court of the United States in Davis v. United States, supra, its first Davis decision in 1895, on the second Davis decision, Davis v. United States, 1897, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750 and apparently on Matheson v. United States, 1913, 227 U.S. 540, 33 S.Ct. 355, 57 L.Ed. 631, charged the jury as to Currens' criminal responsibility in terms of the M'Naghten Rules but added glosses of temporary insanity and irresistible impulse. The backbone of the charge given by the court below was the knowledge of right and wrong by the accused, the so-called "right-and-wrong" test of M'Naghten.

We think that there are cogent reasons why the M'Naghten Rules should not be followed or applied today in the courts of the United States. The M'Naghten Rules are to be found, as we have said, in 8 English Reports, Reprint, at p. 722 et seq. (1843), and were engendered by the excitement and fear which grew out of the acquittal of Daniel M'Naghten who had attempted to assassinate Sir Robert Peel, Prime Minister of England, but who instead shot Peel's private secretary, Drummond, because M'Naghten had mistaken Drummond for Peel. The offense against Drummond followed a series of attempted assassinations of members of the English Royal House, including Queen Victoria herself, and attacks on the Queen's ministers. Some of these were considered to have grown out of Anti-Corn-Law League plots. When M'Naghten was acquitted at his trial, The Queen v. M'Naghten, 4 State Trials, N.S. 923 (1843), public indignation, led by the Queen, ran so high that the Judges of England were called before the House of Lords to explain their conduct. A series of questions were propounded to

them.[11]   Their answers, really an advisory opinion which were delivered by Lord Chief Justice Tindal for all fifteen Judges, save Mr. Justice Maule, constitute what are now known as the M'Naghten Rules.   These Rules have fastened themselves on the law of England and on the law of almost all of the States [12] and on all of the federal courts save one.[13]   The earlier rule of English law, first established in Hadfield's case, 27 State Trials 1281, in 1800, was in substance the product rule of Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, and of State v. Pike, 49 N. H. 399, which has been in effect in New Hampshire for over ninety years.   The M'Naghten Rules, which applied primarily the test of knowing the difference between right and wrong, are set out in the ancient book, written by William Lambard of Lincolns Inn, Eirenarcha or of the Office of the Justices of Peace, reprinted at least seven times between 1582 and 1610.   At "Cap. 21.218" of this work Lambard stated:   "If a mad man or a naturall foole, or a lunatike in the time of his lunacie, or a childe y apparently hath no knowledge of good nor euil do kill a mã, this is no felonious acte, nor any thing forfeited by it * * * for they cãnot be said to haue any understanding wil.   But if upõ examinatiõ it fal out, y̆ they knew what they did, & y it was ill, thẽ seemth it to be otherwise."   It will be observed that Lambard laid down as his test of criminal responsibility "knowledge of good or evil".[14]   The phraseology quoted is as antique and creaking as the doctrine of criminal responsibility it announces.   For the words "knowledge of good or evil", the phrase "knowledge of right and wrong" was substituted.   This essential principle, embodied in the M'Naghten Rules,[15] is not 118 years old.   The substance of the M'Naghten Rules was set out in the Eirenarcha over 375 years ago, published in a year in which belief in witchcraft and demonology, even among well educated men, was widespread.   The Eirenarcha itself contains a statute im-

---

11. Biggs, The Guilty Mind.   Harcourt, Brace and Company 1955, pp. 101–107.

12. New Hampshire, under the influence of Dr. Isaac Ray, never adopted the M'Naghten Rules.   See State v. Pike, 1870, 49 N.H. 399, and State v. Jones, 1871, 50 N.H. 369.

13. The Court of Appeals for the District of Columbia Circuit, having adhered to the M'Naghten Rules, plus the irresistible impulse doctrine, substituted what is now known as the Durham formula in Durham v. United States in 1954, 214 F.2d 862.   The Durham decision has made but little headway.   But see the dissenting opinions of Mr. Justice Musmanno and Mr. Justice Bok in Commonwealth v. Woodhouse, 1960, 401 Pa. 242, 261, 264, 164 A.2d 98.   Mr. Justice Cohen also dissented.   See also Pollard v. United States, 6 Cir., 1960, 282 F.2d 450 and Parsons v. State, 1877, 81 Ala. 577, 2 So. 854.   Compare the decisions set out in note 11, cited to the text in Sauer v. United States, 9 Cir., 241 F.2d 640, at page 645.

14. Biggs, op. cit. supra note 11 at p. 84.

15. The answers of the Judges of England can by some simplification be fairly reduced to two rules to determine the criminal responsibility of one pleading insanity as a defense to a crime, as follows: "(1) 'To establish a defense on the ground of insanity it must be clearly proved that, at the time of committing the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing what was wrong.' This rule was amplified with the comment that the knowledge of right and wrong refers to 'the very act charged' rather than to 'knowledge' in the abstract.   (2) 'Where a person labors under partial delusions only and is not in other respects insane,' and commits an offense in consequence thereof, 'he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real.' "

See Weihofen, Insanity as a Defense in Criminal Law.   Commonwealth Fund, 1933, pp. 28–29.   Quoted from "Criminal Responsibility and Psychiatric Expert Testimony", Rept. No. 26, May 1954, p. 3, formulated by the Committee on Psychiatry and Law of the Group for the Advancement of Psychiatry, New York, N. Y.

posing severe penalties for injuries or death caused by witchcraft. The principles of law embodied in the volume were, of course, typical of the thinking of the times.[16]

The M'Naghten Rules are unworkable for a number of reasons. We will try to state some of them. The Supreme Court in its decision in Hotema v. United States, 1902, 186 U.S. 413, 420, 22 S.Ct. 895, 46 L.Ed. 1225, makes it plain that knowingly violating a criminal law will impose criminal responsibility upon a defendant even if he believes his act to be morally right. See also in this connection Sauer v. United States, 9 Cir., 241 F.2d 640, 649. As an example of the unrealistic effect of the M'Naghten Rules in such a situation we cite Hadfield's Case, 27 State Trials (1800). Hadfield, an old soldier who had served at Freymar and had there sustained terrible head wounds, attempted to kill George III because he viewed himself as the saviour of mankind and felt he had to become a sacrifice as had Jesus Christ and consequently he had to be executed in accordance with law in order to attain this end. He concluded that killing the King was the best way to attain quick martyrdom. He failed in the attempt but wounded an equerry. Hadfield, was acquitted.[17] The jury, under an instruction from the Chief Justice, found that Hadfield was under the "influence of insanity at the time the act was committed" and not under the "guidance of reason".[18] In substance the test applied was the product test of Durham or the proximate cause test set out in the dissenting opinion in United States ex rel. Smith v. Baldi, 3 Cir., 1951, 192 F.2d 540, 568.[19] It was good law in England for some 12 years. Hadfield in fact was insane, mentally ill or mentally diseased, yet he would have had to have been declared "sane"[20] under the M'Naghten Rules had that test been applied to him.

Our institutions contain many patients who are insane or mentally ill or mentally diseased and who know the difference between right and wrong. A visit of a few hours at any one of our larger State institutions within this Circuit will convince even the lay visitor of the correctness of this statement. The test, therefore, of knowledge of right and wrong is almost meaningless.

Further the M'Naghten Rules are a sham, as Mr. Justice Frankfurter made plain in his testimony before the Royal Commission on Capital Punishment. He stated in part: " * * * The M'Naghten Rules were rules which the Judges, in response to questions by the House of Lords, formulated in the light of the then existing psychological knowledge. * * I do not see why the rules of law should be arrested at the state of psychological knowledge of the time when they were formulated. * * * If you find rules that are, broadly speaking, discredited by those who have to administer them, which is, I think, the real situation, certainly with us—they are honoured in the breach and not in the observance—then I think the law serves its best interests by try-

---

16. It is interesting to observe that The Country Justice written by Michael Dalton of Lincolns Inn and published in 1680 also repeats the test "knowledge of good or evil". This book has a chapter on witchcraft and describes means of detecting witches and wizards by witchmarks and tells how their familiars may be discovered. It became an authority at witchcraft trials in England.

17. He had the good luck to be represented by Thomas Erskine, later the great Lord Erskine.

18. Hadfield after his acquittal was continued in the custody of the Crown as a demented person.

19. The case came before this court on appeal from a judgment of the United States District Court for the Eastern District of Pennsylvania denying a writ of habeas corpus to Smith. The majority opinion of this court was affirmed, 1953, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549, Mr. Justice Frankfurter dissenting, Mr. Justice Black and Mr. Justice Douglas joining in the dissent.

20. It must be borne in mind that the terms "sane" and "insane" are legal words and not words of art employed by doctors of medicine. See the definition of the term "insane" quoted at an earlier point in the body of this opinion.

ing to be more honest about it. * * * I think that to have rules which cannot rationally be justified except by a process of interpretation which distorts and often practically nullifies them, and to say the corrective process comes by having the Governor of a State charged with the responsibility of deciding when the consequences of the rule should not be enforced, is not a desirable system. * * I am a great believer in being as candid as possible about my institutions. They are in large measure abandoned in practice, and therefore I think the M'Naghten Rules are in large measure shams. That is a strong word, but I think the M'Naghten Rules are very difficult for conscientious people and not difficult enough for people who say, 'We'll just juggle them' * * * I dare to believe that we ought not to rest content with the difficulty of finding an improvement in the M'Naghten Rules * * * " [21]

Mr. Justice Douglas also has indicated his disapproval of the M'Naghten Rules in his article The Durham Rule: A Meeting Ground for Lawyers and Psychiatrists, 41 Iowa L.Rev. 485 (1956).

Mr. Justice Cardozo, in an address before the New York Academy of Medicine in 1928, after referring to the M'Naghten Rules, asked that a definition of insanity be framed. * * * "that will combine efficiency with truth." He said further: "If insanity is not to be a defense, let us say so frankly and even brutally, but let us not mock ourselves with a definition that palters with reality. Such a method is neither good morals nor good science nor good law." "What Medicine Can Do for Law," from Law and Literature and Other Essays and Addresses by Benjamin N. Cardozo, Harcourt, Brace, New York, 1931, at p. 198.

The Royal Commission on Capital Punishment expressed an unfavorable conclusion respecting the M'Naghten Rules with only one of the twelve commissioners dissenting. The Commission said that " * * * the test of responsibility laid down in England by the M'Naghten Rules is so defective that the law on the subject ought to be changed." Report Royal Commission on Capital Punishment, 1953, p. 275.

The Committee on Psychiatry and the Law of the Group for the Advancement of Psychiatry has recommended the abolition of the M'Naghten Rules. The Report of the Committee states: "The law, however, does not allow the psychiatrist to communicate his unique understanding of psychic realities to the Court and Jury. More often, the mutual quest for the 'whole truth' cannot get past a barrier of communication which leaves the psychiatrist talking about 'mental illness' and the lawyer talking about 'right and wrong'." [22]

We state again as was said in the dissenting opinion in United States ex rel. Smith v. Baldi, supra, 192 F.2d at page 567, that the M'Naghten Rules assume: " * * * the existence of a ' * * * logic-tight compartment in which the delusion holds sway leaving the balance of the mind intact * * * '; the criminal retains enough logic * * * so that from this sanctuary of reason he may inform himself as to what the other part of his mind, the insane part, has compelled or permitted his body to do. If the sane portion of the accused's mind knows that what the insane part compels or permits the body to do is wrong, the body must suffer [by punishment]. * * * The human mind, however, is an entity. It cannot be broken into parts, one part sane, the other part insane." [23]

The vast absurdity of the application of the M'Naghten Rules in order to determine the sanity or insanity, the mental

---

21. See Royal Commission on Capital Punishment, September, 1953, p. 102, para. 290, H.M. Stationery Office.

22. See Criminal Responsibility and Psychiatric Expert Testimony, Report No. 26, May 1954, formulated by The Committee on Psychiatry and the Law of the Group for the Advancement of Psychiatry. 1790 ' Broadway, New York, N. Y.

23. The inside quotations are from Glueck's Mental Disorder and the Criminal Law, Little, Brown and Company, pp. 169–170.

health or lack of it, of the defendant by securing the answer to a single question: Did the defendant know the difference between right and wrong, appears clearly when one surveys the array of symptomatology which the skilled psychiatrist employs in determining the mental condition of an individual. This is not the place to set this out in detail but the extent of its substance is suggested by psychiatric textbooks. For example, Henderson and Gillespie in a Text-Book of Psychiatry [24] give 11 pages of "Symptomatology": Strecker-Ebaugh-Ewalt in their Practical Clinical Psychiatry,[25] devote 43 pages to "Methods of Psychiatric Examination," and Noyes, Modern Clinical Psychiatry,[26] employs 25 pages to describe "Symptoms of Mental Disease." These symptomatologies are general in their nature. Many more pages of these works are devoted to descriptions of specific mental diseases. How, conceivably, can the criminal responsibility of a mentally ill defendant be determined by the answer to a single question placed on a moral basis? To state the question seems to us to answer it. All in all the M'Naghten Rules do indeed, as has been asserted so often, put the testifying psychiatrist in a strait-jacket.

Moreover, the question as to the defendant's knowledge of right and wrong puts the psychiatrist, if he can answer the question and does answer it, in a position in which he must state a moral judgment, and in doing so he cannot avoid usurping to some extent the function of the jury.

In concluding this phase of this opinion we point out that many highly civilized European nations have adopted rules of law relating to the criminal responsibility of offenders suffering from mental disorders or mental weaknesses which bear no relation to the M'Naghten Rules. These nations include Sweden, Denmark, Norway, France, Belgium, Germany, Luxembourg and Finland. Scotland does not follow the M'Naghten Rules.[27] No harm seems to have inured to the administration of criminal justice in their courts by not asking the testifying psychiatrist whether the accused knows the difference between right and wrong.

Finally, we must point out that the M'Naghten Rules are not only unfair to the individual defendant but are dangerous to society. As was stated in "The Guilty Mind", "[T]he mental competency of recidivists should be questioned by realistic means at the earliest possible stage. So long as the courts judge criminal responsibility by the test of knowledge of right and wrong, psychotics who have served prison terms or are granted probation are released to commit increasingly serious crimes, repeating crime and incarceration and release until murder is committed. Instead of being treated as are ordinary criminals, they should be confined to institutions for the insane at the first offense and not be released until or unless cured."[28] The throwing of the mentally ill individual from the jail back into the community, untreated and uncured, presents a great and immediate danger.

We come now to a most difficult point in this difficult case. The United States, both in its brief and on oral argument insists that we must follow the decisions of the Supreme Court in the Davis and Matheson cases. Is this a correct view of our sworn duty as judges of the United States? In the first Davis case, the Supreme Court expressed approval of the charge to the jury which was couched in terms of the M'Naghten Rules test of knowledge of right and wrong but the precise issue before the Court was which party had the burden of proof in regard to the defense of insanity. The Court

24. Oxford University Press, 7th ed., 1950, p. 107.

25. Blakiston Co., 7th ed., 1951, p. 29.

26. W. B. Saunders Co., 4th ed., 1953, p. 95.

27. Biggs, Procedures for Handling the Mentally Ill Offender in Some European Countries, 29 Temple L.Q. 254 (1956).

28. Biggs, op. cit. supra note 11 at pp. 144–145.

did not say that the M'Naghten Rules constituted the whole of the law of insanity as that law was to be applied in the courts of the United States. A similar observation can be made in respect to the second Davis decision. The Supreme Court did not state that the standards supplied by the M'Naghten Rules constituted the exclusive body, a sole and single *corpus*, of law from which the tests of the criminal responsibility of an alleged insane accused were to be drawn. As we read the opinion and the record in the second Davis case, it appears to us that the Supreme Court reviewed the issue as to whether the trial judge's instructions had restricted the standard to a lesser scope than that required by the limited M'Naghten Rules themselves. The Supreme Court ruled that the charge as requested by Davis was given by the trial court and that this was adequate and sufficient under the circumstances of the case and that therefore the defendant could not validly object. Furthermore in both the first and second Davis decisions one cannot avoid the conclusion that the Supreme Court's approval of a charge based on the M'Naghten Rules standard is somewhat weakened by the paramount fact that the two medical witnesses were asked—indeed, one may say almost required—to testify as to the defendant's mental capacity to commit the crime in terms of his awareness of whether his homicidal act was right or wrong. There was little evidence given as to *why* Davis committed the crime. Most of the testimony went to the issue, relevant but hardly disputed, as to *how* he committed it. The scope of the examination was so limited that the picture of the defendant as a whole man, his symptomatology, never emerged. The issue of his criminal responsibility, his *mens rea* was narrowed by the testimony itself to Davis' knowledge of the evil quality of his act.

The Matheson case arose in the Alaska Territory. The homicide by shooting had taken place following an ordinary barroom brawl. There was no expert testimony as to Matheson's mental condition.

Though the plea was not guilty by reason of insanity or its equivalent, the evidence as to abnormal behavior on the part of the defendant was comparatively slight and what there was was given largely by members of his family and by guards at the jail. There was some testimony admitted by the trial court as to the mental illness or feeble mindedness of the defendant and of some of his relatives. The trial court charged the jury in respect to the defendant's criminal responsibility in terms of the M'Naghten Rules and of the second Davis decision. It should be pointed out, however, that the trial judge also charged the jury: "If you believe that the shooting was the direct result or offspring of insanity, you should acquit, if of passion or revenge, you should convict." The language quoted is very close to the essentials of the Durham formula stripped of all glosses. As we read the record, the issues presented on appeal were whether the trial court had charged the jury in accordance with the Davis decisions and as the defendant had requested. The Supreme Court pointed out that the charge given was exactly that requested by the defendant and was in accord with the Davis decisions and therefore the defendant could not complain.

There has been no recent direct ruling by the Supreme Court as to what should constitute a charge on the issue of criminal responsibility when a defense of insanity or mental illness has been interposed by an accused in a trial in a federal court. The later cases deal with refusals to grant writs of habeas corpus or new trials in state courts. We think that the case of Leland v. Oregon, 1952, 343 U.S. 790, 800, 72 S.Ct. 1002, 1008, is typical. There Mr. Justice Clark stated: "The science of psychiatry has made tremendous strides since that test was laid down in M'Naghten's Case, but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law."

The accent has been placed by the Supreme Court on the legal conclusion that

the requirements of due process have been met by State tribunals if they have applied the M'Naghten Rules. The Supreme Court has not expressed approval of the M'Naghten Rules as the basis for a charge in a federal court for nearly 50 years, since the Matheson decision, and in that case, as we have indicated, the Court tacitly approved that portion of the charge which instructed the members of the jury that if they believed that the shooting "was the direct result or offspring of insanity" they should acquit; an instruction, we reiterate, which is very close to the Durham formula. The Matheson decision presents a paradox which cannot be solved at this level. In Sauer v. United States, 241 F.2d 640, certiorari denied, 1957, 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539, Judge Barnes, speaking for the Court of Appeals for the Ninth Circuit, discusses the advantages and disadvantages of the M'Naghten Rules and the Durham formula and states that it is for the Supreme Court or for Congress to make any drastic revision in respect to the rule of criminal responsibility in this field. But the M'Naghten Rules are not based on any Act of Congress. Judge Barnes' statement assumes that the Supreme Court has ruled that the M'Naghten Rules are paramount and exclusive and this, we believe, is not the situation. It must be pointed out nonetheless that the Court of Appeals for the District of Columbia Circuit, in applying the Durham formula perhaps had a greater degree of autonomy in the decision-making process in relation to a violation of a statute having local application than have other courts of appeals or the district courts of other circuits. Durham was convicted of house-breaking under the D.C.Code, § 22–1801, 22–2201, and 22–2202 (1951). In Fisher v. United States, 1946, 328 U.S. 463, 476, 66 S.Ct. 1318, 1325, 90 L.Ed. 1382, the Supreme Court stated: "Matters relating to law enforcement in the District are entrusted to the courts of the District. Our policy is not to interfere with the local rules of law which they fashion, save in exceptional situations where egregious error has been committed." It appears, therefore, that in the absence of egregious error on its part, the Court of Appeals for the District of Columbia Circuit may lay down a rule of criminal responsibility within broad limits not available to the other lower federal courts.

The logic of this doctrine is not entirely apparent in situations, similar to that at bar, which are or should be of universal uniform application throughout all the courts of the United States wherever situated. We may doubt if the Supreme Court would apply a special status to the courts of the District of Columbia where principles of strict federal law are involved such as the Fugitive Felon Act, 18 U.S.C.A. § 1073, or the Lindberg Act, 18 U.S.C.A. §§ 1201, 1202. We think that perhaps the Supreme Court has withheld the granting of certiorari in such cases as Sauer v. United States, supra and has not laid down a rule for the federal courts in respect to the criminal responsibility of the mentally ill because it desires to treat the circuits as it does the States, as laboratories for the development of substantive law. There is a hint, of this we think, in Mr. Justice Clark's words in Leland v. Oregon, supra, when he spoke of not requiring the states to eliminate the "right and wrong" rule from "their law". Certainly the Durham decision and the Durham formula are not egregious error or the Supreme Court would have corrected them. But beyond this a body of law consisting of approximately 70 decisions has been built around the Durham decision and the Durham formula over a period of approximately 7 years. The rule, however, remains the same as it was when it was laid down in 1954. The silence of the Supreme Court does not signify its acquiescence in or approval of the Durham formula but certainly it can be said that the authority of the Davis decisions has been somewhat diminished by the "result or offspring of insanity" charge of Matheson. A countervailing consideration, however, may have been that in such a completely federal suzerainty as was the

Alaska Territory the rule of egregious error applied in the District of Columbia might also have been deemed to have been applicable. Matheson was indicted for murder in the first degree pursuant to Section 1883 of the Compiled Laws of Alaska, 30 Stat. 1253 (1899). It is necessary to state, however, that the effect of the Matheson ruling, whether vis-a-vis the M'Naghten Rules or the Durham formula, must be deemed to be weakened by the fact that the testimony adduced to prove that Matheson was insane was of little weight or consequence.

But quite aside from the foregoing there is, we think, another and a more important and more valid approach to this problem which leads us to the belief that the Supreme Court today would not apply the M'Naghten Rules in formulating a charge for a United States court. Some three hundred and seventy-five years have passed since the Eirenarcha was written. One hundred and eighteen years have elapsed since the M'Naghten Rules were laid down by the judges of England. Over sixty years have gone by since the second Davis decision was written and nearly fifty years have passed since the Matheson case was decided. Even if it be assumed, as we think it should not be, that the import of these decisions was most favorable to the M'Naghten Rules, the advance of medical science assuredly has vastly altered the

background against which they must be considered. At the time of the Eirenarcha the science of psychiatry, if it can be said to have existed at all, was in its utmost infancy. Any modern conception of it would have been deemed among the black arts and a modern practitioner would have been deemed ripe for the burning. In 1843, when the M'Naghten Rules were promulgated, the foundations of sound forensic psychiatry were being laid. At M'Naghten's trial a textbook by Dr. Isaac Ray was employed which stated advanced principles for determining the criminal responsibility for the mentally ill.[29] Since the turn of the century great strides in the advancement of psychiatry have been made. And since the beginning of World War II the treatment and the cure of the mentally ill, the insane, has progressed at an astounding pace. But the criminal law has failed utterly to move forward with this achievement. In this country it has with the few exceptions noted remained unchanged. It is as if those who sit cannot read.

■ We believe that the Supreme Court in view of the present state of medical knowledge, would not approve the M'Naghten Rules and would not impose them as the test to be applied today by a jury to determine the criminal responsibility of a mentally ill defendant in a trial in a federal court. We con-

---

29. This matter is accurately set out as follows: "It is stated frequently that the rules of M'Naghten's Case reflected the status of psychiatric knowledge of that day, but in fact such is not the case. When Cockburn defended Daniel M'Naghten, he frequently referred to a treatise on criminal insanity written by the eminent American psychiatrist, Isaac Ray. See: Diamond, Bernard: Isaac Ray and the Trial of Daniel M'Naghten, Am.J. Psychiat., 112: 651, 1956. To a very considerable extent Ray's views reflected concepts of mental function essentially dynamic in character. For example, see: Ray, Issac: Medical Jurisprudence of Insanity. Boston: Little & Brown Co., 1838, Chapter 6 at page 152. We should recall also that Isaac Ray influenced another important opinion through his close correspondence with Justice Doe of the

New Hampshire Supreme Court, which handed down State v. Pike in 1870. 49 N.H. 399. Also State v. Jones, 1871, 50 N.H. 369. See: Reik, Louis E.: The Doe-Ray Correspondence, Yale L.J. 63: 183, 1953. This early precursor of Durham used similar language to its modern counterpart. Merely on the face of this fact, it can hardly be contended that Durham exceeds the status of current psychiatric knowledge. It merely catches up with knowledge well known at the time of the M'Naghten and Pike opinions."

See Durham Plus Five Years, Development of the Law of Criminal Responsibility in the District of Columbia, Andrew S. Watson, M.D. The American Journal of Psychiatry, October 1959, note 9, cited to the text, p. 295.

clude, therefore, in the light of all the circumstances, that we are not constrained to adhere to and uphold the M'Naghten Rules.

But what test should be laid down? In suggesting this inquiry we are aware of our own limitations and that this task is veritably one for the Supreme Court. But we have a case before us which requires our disposition and the issue is one which does not seem an apt one for certification pursuant to 28 U.S.C. § 1254(3).

Currens' counsel contends here that the Durham formula in the form of the request for instructions made by him, practically a verbatim repetition of the charge stated in Durham v. United States, supra, 214 F.2d at page 875, is a sound one and should be applied by the court below upon remand. It has been stated time and time again that psychiatry now regards and recognizes man as an integrated personality and that he cannot be compartmentalized and that his cognitive faculties cannot be detached from his emotions. The Durham formula does not restrict the inquiries to be made of the psychiatrist to particular symptoms or to the specific question: "Does the defendant know the difference between right and wrong?" The psychiatrist may give a picture of the whole man to the court and jury.

It should be pointed out how much the present criminal law differs from the civil law in this respect. For example, when a commission in lunacy is sued out in Pennsylvania or Delaware for the appointment of a guardian, the court does not inquire whether the mentally afflicted individual knows right from wrong but whether he is mentally ill and capable of handling his property.[30] It is as important in the criminal case as in the civil case that the entire symptomatology of the defendant be explored.

The Durham formula has been severely criticized on the ground that it is too vague and indefinite to provide a workable rule for the determination of criminal responsibility. Two of the key words "disease" and "defect" are defined to a limited extent in the opinion. The word "product" was not defined and this led the American Law Institute to reject the Durham formula as a test for its proposed Model Penal Code.[31] See also the excellent opinion of Judge Brosman in United States v. Smith, 5 U.S.C.M.A. 314, which is critical of the Durham formula because of alleged vagueness.

---

30. The concern of the modern Pennsylvania Mental Health Act, Act of June 12, 1951, P.L. 533, 50 P.S. § 1071 et seq., which deals with those accused of crime but not on trial for crime, is with the defendant's mental health, not with his knowledge of right or wrong.

The Committee on Psychiatry and Law of the Group for the Advancement of Psychiatry, in its Report No. 26, May 1954, Criminal Responsibility and Psychiatric Expert Testimony, page 4, recommended the following bill as the test for criminal responsibility in which the definition of "mental illness" was extracted from the Pennsylvania Mental Health Act for enactment by the Pennsylvania Legislature. Section I. *Definition of mental illness:* Mental Illness shall mean an illness which so lessens the capacity of a person to use (maintain) his judgment, discretion and control in the conduct of his affairs and social relations as to warrant his commitment to a mental institution." "Section II. *When mental illness is a defense:* No person may be convicted of any criminal charge when at the time he committed the act with which he is charged he was suffering with mental illness as defined by this Act, and in consequence thereof, he committed the act." "Section III. When the defendant is acquitted on the defense of mental illness, such a finding shall be recorded as part of the verdict." "Section IV. When such a verdict is recorded, the Court shall immediately commit the defendant to a public institution for the custody, care and treatment of cases of the class to which the defendant belongs, and the defendant shall not be discharged therefrom unless and until the Court has adjudicated that he has regained his capacity for judgment, discretion and control of his affairs and social relations."

Though the proposed statute is a sound one we think it is not advisable to tie criminal responsibility in a federal proceeding to a state statute, however apt.

31. See Wechsler, The Criteria of Criminal Responsibility, 22 U.Chi.L.Rev. 367 (1955).

The phrase "product of" employed in the original Durham decision, 214 F.2d 862, was explained in Carter v. United States, 1957, 102 U.S.App.D.C. 227, 252 F.2d 608, 615–617 and also in Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52. In the Carter decision Chief Judge Prettyman said: "The simple fact that a person has a mental disease * * * is not enough to relieve him of responsibility for a crime. There must be a relationship between the disease and the criminal act; and the relationship must be such as to justify a reasonable inference that the act would not have been committed if the person had not been suffering from the disease. There are two key factors in this defense, (1) a mental disease and (2) a critical relationship between that disease and the alleged criminal act. If the disease produces a mental derangement of such character as necessarily to influence the accused's every action, there is no further problem." [102 U.S.App.D.C. 227, 252 F.2d 615]

We do not suggest that the Durham decision presents the best or the only feasible test for the determination of the criminal responsibility of the insane or mentally ill defendant. It does, however, assuredly present a possible one precisely as the M'Naghten Rules do not. What has been stated has been of use, we think, in exploring the dimensions of our problem.

■ To achieve the necessary foundation to resolve the vital issue of criminal responsibility it is necessary that the entire picture of the defendant be presented to the court and to the jury insofar as the rules of evidence will allow. The defendant's entire relevant symptomatology must be brought before the court and fully explained. Such a course assigns to the medical expert, the psychiatrist, his proper duty in the criminal proceedings. The psychiatrist must make his contribution, from his knowledge, experience and examinations of the accused, in respect to his behavior. Mental illness, resulting in criminal acts, is not a sudden growth, even if the prohibited conduct seems, at first sight, to be of a sudden, explosive nature. The way must be cleared in every case, in which the mental condition of the defendant is at issue, for the psychiatrist to explain the condition of the defendant to the jury in understandable terms. Here, of course, the fundamental problem is one of communication between the psychiatrist on the one hand and the judge and jury on the other. The psychiatrist, of course, cannot investigate the inner nature of the accused by the same methods that a detective may employ to investigate a larceny. He can proceed to employ a battery of modern tests, which need not be enumerated here, which will aid him objectively to determine the mental condition of the accused. The results of these tests and his expert opinions must be brought before the court and jury in a meaningful manner. The psychiatrist should not be asked or be permitted to answer the question: "Did the defendant, at the time he committed the act of which he is accused, know the difference between right and wrong?", or "Knowing the right, was he unable, by reason of his mental condition, to adhere to it?" Such questions, put in the course of a trial, are so vague as to be meaningless. The law must permit the psychiatrist to communicate his knowledge of psychic realities to the court and jury. The whole of the technical knowledge of the medical witnesses in respect to the accused should be placed before the court. But, as we have said, technical terms should be avoided where possible. There is but small advantage, if any, in informing the court or jury that it is the opinion of the psychiatrist that a defendant at the time he committed the crime was suffering from hebephrenic schizophrenia. The term itself requires extensive explanation.

Were this our only objective the Durham formula might be held to be sufficient. As we have previously pointed out, the psychiatrist, under the Durham formula, may give the jury a complete picture of the defendant's mental condition. It is not enough, however, in a case such as that at bar, to give the jury

a complete picture of the defendant's mental condition. The jury must be further provided with a standard or formula by means of which it can translate that mental condition into an answer to the ultimate question of whether the defendant possessed the necessary guilty mind to commit the crime charged. Our second objective is, therefore, to verbalize the relationship between mental disease and the concept of "guilty mind" in a way that will be both meaningful to a jury charged with the duty of determining the issue of criminal responsibility and consistent with the basic aims, purposes and assumptions of the criminal law. See the illuminating concurring opinion of Judge Burger in Blocker v. United States, supra.

The concept of *mens rea*, guilty mind, is based on the assumption that a person has a capacity to control his behavior and to choose between alternative courses of conduct. This assumption, though not unquestioned by theologians, philosophers and scientists, is necessary to the maintenance and administration of social controls. It is only through this assumption that society has found it possible to impose duties and create liabilities designed to safeguard persons and property. See, e. g., Gregg Cartage & Storage Co. v. United States, 1942, 316 U.S. 74, 79–80, 62 S.Ct. 932, 86 L.Ed. 1283; Steward Machine Co. v. Davis, 1937, 301 U.S. 548, 590, 57 S.Ct. 883, 81 L.Ed. 1279; Fisher v. United States, 1945, 80 U.S.App.D.C. 96, 149 F.2d 28, 29. Essentially these duties and liabilities are intended to operate upon the human capacity for choice and control of conduct so as to inhibit and deter socially harmful conduct. When a person possessing capacity for choice and control, nevertheless breaches a duty of this type he is subjected to the sanctions of the criminal law. He is subjected to these sanctions not because of the act alone, but because of his failure to exercise his capacity to control his behaviour in conformity with the demands of society. For example, an act of homicide will create no liability, only civil liability or varying criminal liability depending on the nature of the mental concomitant of the act. Generally, the greater the defendant's capacity for control of his conduct and the more clearly it appears that he exercised his power of choice in acting, the more severe is the penalty imposed by society. Thus, the sanctions of the criminal law are meted out in accordance with the actor's capacity to conform his conduct to society's standards, through the capacity for choice and control which he possessed with respect to his act.

It follows, we believe, that where there is a reasonable doubt as to whether a particular person possesses capacity of choice and control, i. e., capacity to conform his conduct to society's standards there is a reasonable doubt as to whether he possessed the necessary guilty mind. A test for criminal responsibility should incorporate this analysis insofar as it is helpful as a means by which the jury can relate a defendant's mental disease to the concept of the guilty mind. It should be made clear to the jury that the fact that a defendant was mentally diseased is not determinative of criminal responsibility in and of itself but is significant only insofar as it indicates the extent to which the particular defendant lacked normal powers of control and choice at the time he committed the criminal conduct with which he is charged. In other words the test must provide the jury with a verbal tool by which it can relate the defendant's mental disease to his total personality and by means of which it can render an ultimate social and moral judgment.

The Durham formula obviously does not meet these requirements. Under that test the prosecution must prove, in substance, that the act committed was not the product of mental disease or defect. The test stresses, to the complete exclusion of all other considerations, a possible causal connection between the mental disease with which the defendant is afflicted and the act which he committed. When considering this test it is natural to think of the mental disease as a distinct vital force in the defendant's mind, producing some acts but not

others. Insofar as it has this effect the test is, in much the same way as the M'Naghten Rules are, subject to the criticism that it wrongly assumes that the mind can be broken up into compartments, one part sane and the other insane. Moreover, the test, limited as it is to a supposed causal connection between mental diseases and criminal acts omits the most important step in deciding the issue of criminal responsibility namely that of determining the total mental condition of the defendant at the time he committed the act, and providing the jury with a standard by means of which an ultimate social and moral judgment, can be rendered. Indeed, many of the tests set up in Anglo-American jurisprudence, including knowledge of good or evil of the Eirenarcha, the product test of Hadfield, the "sole cause" standard of Parsons v. State, 1877, 81 Ala. 577, 2 So. 854, the M'Naghten Rules, the product rule of State v. Pike, supra, the "direct result or offspring" of insanity test of Matheson, and the proximate cause standard of the dissenting opinion in United States ex rel. Smith v. Baldi, supra, seem to have a similar failing. They do not take account of the fact that an "insane" defendant commits the crime not because his mental illness causes him to do a certain prohibited act but because the totality of his personality is such, because of mental illness, that he has lost the capacity to control his acts in the way that the normal individual can and does control them. If this effect has taken place he must be found not to possess the guilty mind, the *mens rea,* necessary to constitute his prohibited act a crime.

■ We are of the opinion that the following formula most nearly fulfills the objectives just discussed: The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated.[32]

32. The test approved is drawn from part (1) of the test proposed, after long and careful consideration, by the American Law Institute in its Model Penal Code, which is as follows: "Mental Disease or Defect Excluding Responsibility.

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

"(2) The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

We are unable to accept the phrase "to appreciate the criminality of his conduct." This phrase would overemphasize the cognitive element in criminal responsibility and thus distract the jury from the crucial issues while being little more than surplusage. The cognitive element would rarely be significant, and indeed would be absent, in the case of an individual in an extreme state of stuporous catatonic schizophrenia, a condition of living death, and in the case of the raving maniac or the imbecile. While persons in the two latter categories may commit acts which are essentially criminal in their nature nonetheless they are rarely brought to trial but rather are committed forthwith to mental institutions.

As we have indicated earlier in this opinion we agree fully with part "(2)" of the American Law Institute proposal set out above.

The test approved by us, while based primarily on the American Law Institute proposal, is similar to that approved in part "(c)" of that suggested by the Royal Commission on Capital Punishment which in turn borrowed it from the British Medical Association. The full text recommended by the Commission is as follows: "The jury must be satisfied that, at the time of committing the act, the accused, as a result of disease of the mind (or mental deficiency)[6] (*a*) did not know the nature and quality of the act or (*b*) did not know that it was wrong or (*c*) was incapable of preventing himself from committing it." Footnote 6, supra, is cited to subheading "B" of the Commission's Report, "Mental Deficiency" and the reason why the phrase "or mental deficiency" was placed in brackets need not be given here. See Royal Commission on Capital Punishment, op. cit. pp. 110–111, and pp. 117–118.

Precisely, then, how should that charge in the instant case be formed? First we state that the charge was an excellent one in all respects save those portions of it which dealt with Currens' mental condition. The charge as to "temporary insanity," based we assume on Currens' plea of intoxication, had sufficient evidence to support it and was adequate for its purpose. We are of the opinion that the court should not have charged on irresistible impulse in the terms in which it did. The evidence shows that Currens may have acted on impulse when he got into the automobile "to get out of the rain" but that impulse and the impulse to drive the car away will fit into the test which we have suggested above. The trial court also charged correctly, under the ruling of the first Davis decision, if Currens had submitted believable evidence "sufficient to raise a reasonable doubt that he was sane" when he took the automobile, then the burden was upon the United States to establish beyond a reasonable doubt that he was sane and mentally capable of forming the specific criminal intent to commit the crime with which he was charged. We are required, therefore, to frame or to suggest a charge only on the issue of the criminal responsibility of Currens, assuming, as we think we must, that the burden of proving that he had the necessary criminal intent had shifted to the United States.

We are of the opinion that the following would be an acceptable charge: "If you the jury believe beyond a reasonable doubt that the defendant, Currens, was not suffering from a disease of the mind at the time he committed the criminal act charged, you may find him guilty. If you believe that he was suffering from a disease of the mind, but believe beyond a reasonable doubt that at the time he committed the criminal conduct with which he is charged he possessed substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated you may find him guilty. Unless you believe beyond a reasonable doubt that Currens was not suffering from a disease of the mind or that despite that disease he possessed substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated you must find him not guilty by reason of insanity. Thus, your task would not be completed upon finding, if you did find, that the accused suffered from a disease of the mind. He would still be responsible for his unlawful act if you found beyond a reasonable doubt that at the time he committed that act, the disease had not so weakened his capacity to conform his conduct to the requirements of the law which he is alleged to have violated that he lacked substantial capacity to conform his conduct to the requirements of that law. These questions must be determined by you from the facts which you find to be fairly deducible from the evidence in this case."

The other points raised by Currens do not require consideration. The able trial judge conducted a difficult trial with the utmost fairness.

Currens was aptly sentenced to the custody of the Attorney General pursuant to Section 5010(b), Title 18 U.S.C. We are informed by the United States Attorney that Currens is about to be transferred to a federal medical center for treatment. Since we will reverse the judgment of conviction we are concerned with the disposition of Currens should he be found not guilty by reason of insanity. Moreover, we are generally concerned with the problem of what procedure is proper when a person is acquitted by reason of not having possessed substantial capacity to conform his conduct to the requirements of the criminal law at the time he committed the conduct with which he was charged.

Courts of appeals have differed in their views as to available procedure in the

---

Parts "(a)" and "(b)" of the test suggested by the Royal Commission lead straight back into the M'Naghten Rules and in our judgment, for reasons already stated, should be eschewed.

event that a person is found not guilty of a federal criminal charge by reason of insanity. See Pollard v. United States, 6 Cir., 282 F.2d 450, 464, Order of Issuance of New Mandate, 6 Cir., 1960, 285 F.2d 81 and Howard v. United States, 5 Cir., 1956, 229 F.2d 602, 608 (Rives, J. dissenting), but compare Sauer v. United States, 9 Cir., 1957, 241 F.2d 640, 651–652, note 32 and 1881, 17 Op.Atty.Gen. 211. In any event, should Currens be acquitted at his new trial, the federal authorities should bring him and his condition to the attention of the State authorities to the end that he may not remain in a position in which he may be a danger to himself or to the public.

The judgment of conviction will be reversed and a new trial ordered, with directions to proceed in accordance with this opinion.

HASTIE, Circuit Judge (dissenting in part).

This is not, in my view, a case where the accused has been prejudiced by the traditional charge on insanity which has heretofore been used by trial courts and approved by appellate courts in the great majority of federal cases. I am keenly aware that traditional formulations, devised long ago by common law judges in an attempt to describe to juries the mental condition which should relieve an offender of legal responsibility for his violations of the criminal law, can and should be revised and improved in the light of increasing understanding of mental aberration and antisocial conduct. But that problem needs to be faced and I think should be faced by an appellate court only in a case where the traditional formulation has worked, or may have worked, an injustice.

The charge which this court is now requiring on the issue of insanity has much the same significance as a guide for evaluation of the criminal psychopath as does that form of the so-called irresistible impulse test which was part of the charge actually given. The irresistible impulse test, as it appears in the trial court's charge, defines legal insanity in terms of "mental disease" which has made the actor's "will, or the governing power of his mind" ineffective as a controlling force. This court's formulation requires acquittal if a "disease of the mind" has deprived the actor of "substantial capacity to conform his conduct to the requirements of the law he is alleged to have violated". Both formulations direct attention to the critical issue of the effect of mental disease upon the capacity of the actor to control his behavior and to exercise the self-restraint which the law requires. This court's formulation is preferable in that it substitutes specific reference to control over the conduct in question for the more generalized conception of loss of will power. See Wechsler, The Criteria of Criminal Responsibility, 1954, 22 Univ. of Chi.L.Rev. 367, 369–372. Moreover, psychiatrists may well reject talk of destroying the will as unscientific imagery. Yet, I think either formulation would suffice in this case to cause the jury to consider whether the evidence of sociopathic personality disclosed mental disease and whether this mental disease had so deprived the actor of capacity to control his conduct as to free him from blame for the auto theft in question.

I am the more reluctant to join in ordering a new trial in this case because of another consideration. It may be reasonably clear that a recidivist is emotionally disturbed and needs psychiatric treatment although the evidence permits fact finders to differ as to whether the wrongdoer's mental condition and the relation of his conduct to it are such that he should be held legally accountable for his behavior. Cf. Blocker v. United States, 1959, 107 U.S.App.D.C. 63, 274 F.2d 572. On the evidence, as analyzed in the majority opinion, I think this is such a case. If we should affirm the judgment below, as I think we conscientiously can, the result of appellant's conviction and the consequent invocation of the Youth Correction Act would be his confinement for an appropriate period in a psychiatric institution for such treatment and supervision as are best

calculated, in the light of our present medical knowledge, to accomplish his rehabilitation and cure. On the record this result would be good for the appellant and good for society. On the other hand, as the majority opinion recognizes, it is doubtful whether the federal authorities could require the restraint and psychiatric treatment of the appellant if he should be retried and, by reason of his mental illness, found not guilty. I think we need not and, therefore, should not thus risk the release of one found to be a criminal psychopath when restraint and treatment seem desirable both medically and socially.

For these reasons I would affirm the conviction and commitment of the appellant. In reaching this conclusion I am not unmindful of the important contribution which the majority opinion makes in providing trial judges with more precise and scientific instruction for juries on the relation of mental disorder to criminal responsibility. Indeed, I agree with the majority that in the future trial judges in this circuit should abandon the traditional charge on insanity and adopt the much more satisfactory formulation set out in the opinion of Chief Judge BIGGS.